STATE OF NORTH CAROLINA v. DONALD FOX, ROY LEE FOX, AND
ROBERT CARSON McMAHAN

No. 83

(Filed 9 October 1968)

**1. Criminal Law § 92— joint trial of defendants**

It has been a general rule in this State that whether defendants jointly
indicted would be tried jointly or separately was in the sound discretion
of the trial court, and, in the absence of a showing that a joint trial had
deprived the movant of a fair trial, the exercise of the court's discretion
would not be disturbed upon appeal.

**2. Criminal Law § 95— admissibility of confession implicating code-
fendants — old rule**

Prior to the decision in *Bruton v. United States*, 391 U.S. 123, the rule
in this State was that the admission of the extrajudicial confession of one
codefendant, even though it implicated another against whom it was inad-
missible, was not error, provided the trial judge instructed the jury that
the confession was evidence only against the confessor and must not be
considered against another.

**3. Criminal Law § 74— valid confessions — best evidence of guilt**

A confession legally obtained is clearly competent against the defendant
who made it and is the best evidence of his guilt.

**4. Constitutional Law § 31; Criminal Law § 95— admissibility of
confession implicating codefendant — denial of confrontation right**

Under the decision in *Bruton v. United States*, 391 U.S. 123, which is
binding in this jurisdiction and is to be applied retroactively, the admis-
sion in a joint trial of nontestifying defendant's extrajudicial confession
which implicates his codefendants is a violation of the codefendants'
right of cross-examination secured by the confrontation clause of the
Sixth Amendment, even though the court instructs the jury that the con-
fession is admissible only against the declarant; if, however, the declar-
ant can be cross-examined, a codefendant has been accorded his right to
confrontation.

**5. Constitutional Law § 31— right of confrontation — obligatory on
the States**

The Sixth Amendment's right of an accused to confront the witnesses
against him is a fundamental right and is made obligatory on the States
by the Fourteenth Amendment.

**6. Criminal Law § 92— joint trials — duty to exclude confession im-
plicating codefendants**

As a result of the decision in *Bruton v. United States*, 391 U.S. 123,
which renders inadmissible the confession of a nontestifying defendant
which implicates his codefendants, the trial court in a joint trial of de-
fendants must exclude extrajudicial confessions unless all portions which
implicate defendants other than the declarant can be deleted without
prejudice either to the State or the declarant; failing this, the State must
choose between relinquishing the confession or trying defendants separately.

**7. Criminal Law § 75—   admissibility of confessions — pre-Miranda tests**

Although admissibility of confessions in this homicide prosecution was not dependent upon whether defendants were given the warnings specified in *Miranda v. Arizona*, 384 U.S. 436, the question remains whether the confessions were freely and voluntarily given and whether the officers employed the procedural safeguards then applicable.

**8. Criminal Law § 75—   confessions — voluntariness rule**

An extrajudicial confession of guilt by an accused is admissible against him only when it is voluntary.

**9. Criminal Law § 75—   confessions — test of voluntariness — suggestion of hope or fear**

When an investigating officer offers some suggestion of hope or fear to one suspected of crime and thereby induces a statement in the nature of a confession, such statement is involuntary, and hence incompetent as evidence.

**10. Criminal Law § 76—   confessions obtained by promise or threat — question of law**

Whether conduct of investigating officers amounts to a threat or promise which will render a subsequent confession involuntary and incompetent is a question of law reviewable on appeal.

**11. Criminal Law § 76—   multiple confessions — admissibility**

The State offered in evidence two confessions by a defendant. Upon the voir dire the evidence was that the first confession was made after a police officer had told defendant (1) that it would be better for him in court if he told the truth and (2) that he might be charged with the lesser offense of accessory to the homicide rather than as a principal. Two days later, upon being told that he could "make a voluntary statement," defendant made the second confession to two other officers who did not know of the previous statement. *Held:* The language of the original officer constituted a suggestion of hope which rendered both confessions involuntary and incompetent.

**12. Criminal Law § 76—   admissibility of subsequent confession — presumptions**

Where a confession has been obtained under circumstances rendering it involuntary, a presumption arises which imputes the same prior influence to any subsequent confession, and this presumption must be overcome before the subsequent confession can be received in evidence.

**13. Criminal Law § 75—   pre-Miranda confession — request for counsel**

In prosecution begun after the decision in *Escobedo v. Illinois*, 378 U.S. 478, but before the decision in *Miranda v. Arizona*, 384 U.S. 436, if the defendant, after requesting an attorney, was not given an opportunity to confer with him prior to making his confession, the confession is inadmissible in evidence against him.

**14. Criminal Law § 76—   confessions — voir dire — duty to make findings of fact**

Where the evidence of the State and the defendant upon the voir dire

was sharply conflicting as to whether defendant had requested an attorney before or after making a confession, the failure of the trial judge to make a finding of fact with respect to this material point is error and warrants a new trial.

APPEAL by defendants Roy Lee Fox and Robert Carson Mc-Mahan from *Campbell, J.,* February 1965 Criminal Session of BUN-COMBE.

At the November 1964 Session of Buncombe, Roy Lee Fox, Arrlie Fox, Donald Fox, and Carson McMahan were jointly charged in two bills of indictment. One alleged that on 10 November 1964 the four men "did unlawfully, willfully and feloniously and of their malice aforethought kill and murder Ovella Curry Lunsford while they . . . were committing the crime of Robbery with firearms . . . ." The other alleged that, about midnight on 10 November 1964, the same four individuals, with the intent to steal, take, and carry away the property of Charles and Ovella Lunsford, did feloniously and burglariously break and enter their dwelling while it was actually occupied by them.

Roy Lee Fox (aged 28) is the nephew of Donald Fox (23). Arrlie Fox (16) is the brother of Roy Lee Fox and made his home with him. For several months prior to 10 November 1964, Carson Mc-Mahan (18) had also lived with Roy Lee Fox. Carson's brother married Roy's sister.

When the cases were called for trial, defendants were represented by the following attorneys: Cecil C. Jackson, Esq., appeared for Roy Lee Fox; Don C. Young, Esq., for Arrlie Fox; Shelby E. Horton, Jr., Esq., and W. Paul Young, Esq., for Donald Fox; and Robert E. Riddle, Esq., for Carson McMahan.

The solicitor moved to consolidate the two bills "into one trial." Roy Lee Fox and Carson McMahan each moved that he be tried separately from the other defendants. The solicitor's motion was allowed; defendants' motions were denied.

Neither Roy Lee Fox nor Carson McMahan offered evidence before the jury. Donald Fox introduced evidence but did not testify. Arrlie Fox, after having testified and been cross-examined by the solicitor and counsel for each of the other defendants, rested his case. Immediately thereafter, on the fourth day of the second week of the trial, in the absence of the jury, he tendered a plea of guilty of burglary in the first degree in the form prescribed by G.S. 15-161.1. The judge, after examining him to determine whether his plea was understandingly and voluntarily made, accepted it and entered the

mandatory judgment that Arrlie Fox "be confined in the State's prison for the full term of his natural life." The solicitor then took a *nolle prosequi* as to the murder charge against Arrlie.

On 26 February 1965, the jury found each defendant guilty of the charges of burglary and murder with the recommendation in each case that he be imprisoned in the State's prison for the rest of his natural life. Upon the charge of murder in the first degree, the court adjudged that each defendant be confined in the State's prison for life; upon the charge of burglary in the first degree, that he be similarly confined, this sentence to begin at the expiration of the sentence imposed upon the charge of murder in the first degree. None of the defendants appealed.

On 17 August 1967, Donald Fox filed in this Court a petition for certiorari in which he requested permission to appeal belatedly. For the causes shown, on 6 September 1967, we allowed his petition and, *ex mero motu*, authorized his three codefendants to join him in one consolidated appeal if they desired and were so advised. Thereafter, Roy Lee Fox attempted to prosecute a separate appeal, and Carson McMahan attempted a direct appeal to this Court from a judgment of Bryson, J., entered 23 March 1967, denying him relief in a post-conviction proceeding. We treated this purported appeal as a petition for certiorari to review the original trial and allowed the petition on 7 November 1967. In the exercise of our supervisory jurisdiction, on 7 February 1968, we ordered counsel for Donald Fox, Roy Lee Fox, and Robert Carson McMahan to collaborate with the Attorney General and file one revised transcript of the proceedings in the original trial. In consequence, the record proper and an agreed case on appeal were finally filed 9 April 1968, and the case was set for argument at the beginning of the fall term.

Arrlie Fox did not appeal. Donald Fox died on 17 April 1968 from wounds received in a prison riot, and his appeal abated.

At the trial, the State's evidence tended to show the following events: On 9 November 1964, Charles H. Lunsford (54), a farmer living in the Candler section of Buncombe County, sold some hay to Kenneth Treadway for $251.05 in cash. Lunsford put the money received as a payment in his billfold, which, at that time, contained $800.00-$1,000.00. Arrlie Fox, one of the four boys who moved the hay for Treadway, was present at the time. During the moving operation, Arrlie and a co-worker, Hoot Worley, twice went into the Lunsford residence to telephone Treadway for instructions. The telephone was located in a downstairs bedroom to the left of the front door. On the night of 9 November 1964, Arrlie Fox roomed at

the bunkhouse of Treadway Stables. During his stay there, he exhibited to the other boys who roomed there a single-shot nickel-plated derringer, which he owned.

Shortly after 11:00 p.m. on 10 November 1964, the doors and windows of the Lunsford home were all shut and latched, and Lunsford was seated in his kitchen. Hearing a noise, he turned to see a man wearing "a horrible looking mask" and pointing a pistol at him. The man said, "This is a holdup. We came to get your money and we are going to get it." Lunsford threw a bowl of applesauce at the intruder and "rushed him" into the bedroom, where he got him on the bed. After another person hit him in the back of the head, Lunsford got up to find two men pointing guns at him. The second man, shorter than the first and wearing a hat, had a white handkerchief tied over his face. Lunsford called upstairs to his wife that they were being held up. As he struggled with the men, she came downstairs carrying a .22 rifle. One of the men jerked her to one side; the other ordered Lunsford to hand over his pocketbook and fired a shot into the wall behind him. In the ensuing scuffle, Lunsford pulled the handkerchief from the man's face and observed his attacker, whom he later identified as defendant Donald Fox. When Lunsford told his wife to shoot the rifle he was knocked down again. While on the floor he heard two shots fired close together. He then jumped up to see his wife standing in the passageway with blood gushing from her mouth. At that moment the short man had a pistol sticking in Lunsford's side; the other one was pointing a pistol and the rifle directly at Mrs. Lunsford. When she said, "I have been shot. Get me a doctor. I am dying", the two men dashed out of the door.

After concealing his billfold, which contained over $1,000.00, and locking the doors Lunsford began the trip to the hospital in Asheville with his wife. He immediately discovered that the station wagon had a flat tire. He arrived at the hospital with a broken wheel. Here a doctor told him that Mrs. Lunsford had died from massive internal hemorrhages resulting from a bullet wound in her chest. The coroner removed from Mrs. Lunsford's body a .22 caliber lead bullet, which was introduced in evidence as State's Exhibit S-3. In the opinion of John Boyd, an expert in the field of firearms and ballistics, the bullet (S-3) could have been fired from State's Exhibit 13, an inexpensive German Kohm revolver. The alloy content of its barrel was so low that the interior riflings changed with every shot and conclusive comparisons were impossible.

Later that night, Lunsford returned to his home with Deputy Sheriffs Gray Burleson and Elmer Gregg. They found the downstairs

in great disorder. The disconnected bloody bedroom telephone was on the kitchen table. On the floor was an old hat and a piece of blue cloth, which Lunsford had torn from the coat of the shorter intruder. The officers removed one bullet from the bedroom ceiling and another, a .22 caliber bullet "from the derringer," was taken from the floor.

On Wednesday, 11 November 1964, Arrlie Fox and the other three Treadway employees, who had been at the Lunsford home on the 9th, were brought to the sheriff's office for questioning. They were first warned of their right to remain silent; that anything they said could be used against them in court; and that they had a right to counsel. Arrlie denied any knowledge of the Lunsford murder and attempted robbery. When the officers, who had learned he owned a derringer, asked to see it he said he had lost it the previous day.

On Friday morning, 13 November, Chief Deputy Sheriff Willis Mitchell, after warning Arrlie once more of his constitutional rights, questioned him again. At that time Arrlie said he did not want an attorney and he made the statement, which is briefly summarized below:

On 9 November 1964, Arrlie was at the Lunsford home loading hay for Kenneth Treadway. He twice entered the dwelling to make telephone calls. The next afternoon he told the other defendants that he had seen Lunsford paid for the hay and had observed that he had "a pretty good bit of money on him." The four agreed they would get the money from Lunsford and split it.

Carson produced a khaki coat, a woman's blue cloth coat, an old gray hat, and a Halloween mask, which he put in a tow sack. Thereafter, the four drove to a schoolhouse near the Lunsford home where Arrlie put on the overcoat and Halloween mask; Donald put on the hat and blue coat and tied a white handkerchief over his face. Roy gave Arrlie a shell for his .22 derringer and handed his own loaded .22 revolver to Donald. Roy then drove past the Lunsford house, where Donald and Arrlie got out. After Donald had cut the rear tire of the Lunsford station wagon, Arrlie went in the front door and Donald went to the back.

When Lunsford saw Arrlie wearing the Halloween mask he threw a bowl, which hit him on the left side of his head and "addled him for a little bit." Lunsford rushed him and was pulled off by Donald, who told Lunsford he wanted his pocketbook. Lunsford kept hollering, "This is a holdup." Mrs. Lunsford appeared. Arrlie grabbed her but turned her loose when she resisted. Donald jerked the light out

STATE *v.* Fox

and shot the pistol to frighten Lunsford into giving him his pocketbook. Arrlie fired the derringer into the floor. The struggle continued. Mrs. Lunsford hit Donald over the head with a rifle and both he and Arrlie grabbed the barrel. When he heard two shots, Arrlie jerked the gun from the other two. At that time, Donald was down on Lunsford and blood was gushing from Mrs. Lunsford's mouth. Donald's mask had come off, and his face was showing. The two backed out of the kitchen door, taking the rifle with them.

After seeing the Lunsfords leave, Arrlie and Donald hailed Roy and Carson in the truck and told them that Mrs. Lunsford had been shot. In the woods beyond a church on a gravel road, Carson hid the coats, mask, guns, and rifle. After Donald and Arrlie had "straightened up" at the truck stop they went to Roy's home, where all but Donald remained for the night.

Defendants' motion to strike this statement was denied, but the court instructed the jury that they would consider it only as to Arrlie Fox.

On Friday, 13 November 1964, about noon, Arrlie accompanied Sheriff Clay and Deputy Sheriffs Mitchell and Burleson to the Lunsford home, where he "re-enacted the whole crime." He then directed them to the place where they recovered the rifle and a tow sack containing the mask, coats, and pistols.

On 14 November 1964, the day after he was arrested, Donald Fox made a statement introduced in evidence as State's Exhibit 35. Each defendant objected to its introduction. After a *voir dire,* the judge found facts, concluded that the statement had been freely and voluntarily made, and admitted it. Thereafter, he denied defendants' motions to strike it from the evidence.

Since Donald Fox's appeal has abated, the evidence elicited upon *voir dire* and the facts found will not be recited. In admitting the statement, the judge admonished the jurors that they would consider it only as against Donald Fox. Donald's statement implicated all four defendants in the Lunsford murder and attempted robbery and differed in no material particular from the one given by Arrlie. Donald did, however, identify State's Exhibit 13, a .22 revolver with tape around the handle, as the gun he had used at Candler on 10 November 1964.

Investigating officers obtained two written statements from Carson McMahan after his arrest on Friday, 13 November 1964. The first (S-37) was obtained by Deputy Sheriff Albert Cunningham and Lieutenant Elmer Gregg that night. The second (S-36) was made to

Sheriff Clay and Deputy Gray Burleson on Sunday, 15 November 1964. Upon defendants' objections to its introduction, the judge conducted a *voir dire*.

The testimony of Cunningham and Gregg tended to show: Before questioning McMahan about 9:00 p.m. on Friday, 13 November 1964, they told him he did not have to tell them anything; that anything he said could be used against him; and that he was entitled to an attorney before he said anything. McMahan then said that on the night Mrs. Lunsford was shot he went to bed at home at 8:30 p.m. and did not leave the house until the next morning. The officers questioned him again about 10:30 p.m. This time Cunningham told him "that he would be a lot better off in court if he would tell them the truth about what happened. . . . [H]e would probably be charged with accessory to murder." They also showed him the guns, mask, and clothing to let him know that they "knew what had happened" and asked him "if he wanted to give a confession." He said that if he confessed, Roy would kill him. Whereupon, Cunningham promised that he would protect him from Roy if he would just tell the truth about it. McMahan then made a statement, which Cunningham took down in longhand. McMahan read the statement and signed it. This statement, S-37, was not offered in evidence.

On Sunday, 15 November 1964, Deputy Sheriff Gray Burleson and Sheriff Clay talked to McMahan. Burleson's testimony, on *voir dire*, tended to show: He did not know that Officers Cunningham and Gregg had previously secured a statement from McMahan. On Sunday, McMahan was brought into the sheriff's office, where Burleson fully warned him of his constitutional rights. McMahan said that he wanted to make a statement "to get this off of his mind." He then made a statement, which Mrs. Israel, one of the court reporters for Buncombe County, took and transcribed. McMahan, after reading and signing the transcription (S-36), said there were no corrections and that "he felt better that it was over."

McMahan, testifying on the *voir dire*, said that he signed both S-36 and S-37, but that he did so only because Mr. Gregg told him that if he would sign a statement he "wouldn't have to build no time" and that he "would get off with probation." McMahan further said that neither S-36 nor S-37 was a true statement.

After considering the testimony offered on *voir dire*, the judge found facts substantially in accord with the evidence summarized above. He specifically found that Officer Cunningham told McMahan "that it would be better for him if he told the truth about the entire matter and that it would be better for him in court; . . . that

sometime during the evening when said statement, State's Exhibit 37, was being taken, someone in the Sheriff's department mentioned to the defendant that he might be charged with being an accessory to the crime rather than a principal, and this would be a lesser charge." Upon the facts found, Judge Campbell adjudged that the statements given by McMahan, both S-36 and S-37, "were freely and voluntarily given, without threats, duress, coercion or inducements that would in any way violate the defendants' constitutional rights."

Over defendants' objections, after instructing the jurors to consider it only insofar as it pertained to defendant Carson McMahan, he admitted the statement, S-36. Thereafter, he denied defendants' motion to strike it from the evidence. The statement made by Carson McMahan, S-36, implicated all four defendants as conspirators and confederates in the murder and burglary. In all material aspects it corroborated the statements of Arrlie and Donald Fox.

The State also offered in evidence the stenographic transcription of a conversation between Roy Lee Fox and Sheriff H. P. Clay (S-42). In the absence of the jury, the court inquired into the manner in which it was obtained. The evidence upon *voir dire* tended to show:

Roy was arrested on Friday afternoon, 13 November 1964. His wife, father, and two brothers, Hubert and Leon, were also arrested. Roy was placed by himself in a cellblock on the fourteenth floor of the jail, which was put "on maximum security" because of reports that "some of the other Foxes were going to get them out of there." Instructions were given that only attorneys could visit prisoners. Shortly after his arrest, Sheriff Clay informed Roy that he had the right to remain silent; that any statement he made could be used against him; that he had the right to have an attorney present at any time. Roy said that he had done nothing and neither wanted nor needed an attorney, and he signed a statement that he knew nothing about the Lunsford murder. Later, however, when the sheriff showed him the clothing and weapons which had been found in the woods and at the Lunsford home, Roy questioned him "as ·to who had talked."

A warrant charging Roy with the murder of Ovella Lunsford was served upon him on 14 November 1964. Thereafter, he sent Sheriff Clay word by the jailer, Deputy Sheriff Martin, that he wanted to see him. In consequence, around 2:00 or 2:30 p.m. on Saturday afternoon, the sheriff went to the fourteenth floor of the jail to see him. Roy appeared to have been crying. The sheriff again warned him of his rights. Roy then said that he did know something about

"the occurrence on 10 November"; that with Arrlie, Donald, and Carson, he had gone from his house to Plemmons truck stop; that en route he had learned that those three were going "to pull a job"; that he got off at the truck stop; that later they came back and told him what had occurred at the Lunsford home. The sheriff inquired "if he wanted to make an official statement," and Roy said he would let him know. A little later the sheriff went back to the jail and had another conversation with Roy. This time Roy said "he wanted to make a full breast of the thing and get it off his mind." In the sheriff's office he gave a statement, which was electrically recorded as he made it. No officers made any promises or threats to Roy or put any pressure whatever on him to talk. That morning Deputy Sheriff Brooks had told him that his wife had convinced the officers she knew nothing about the crime with which he was charged and that she was going to be released.

After Roy was returned from the sheriff's office, Deputy Sheriff Burleson told the jailer that Fox wanted him to call an attorney. Roy then told the jailer that he wanted Mr. Jackson, and the jailer called him. This was the only telephone call which Roy ever requested. Mr. Jackson came to the jail to see Roy for the first time on Saturday afternoon while Roy was talking with the sheriff. He waited about fifteen minutes, and Roy was returned to his cell.

On the following day, Sunday, Sheriff Clay gave Roy a copy of the stenographic transcription of the statement he had made on Saturday and requested him to sign it if he found it to be correct. At that time, Roy told the sheriff that on Saturday Mr. Jackson had advised him not to sign or say anything unless he was present. Roy had not previously mentioned Mr. Jackson or any other attorney to the sheriff, and this was his first information that Mr. Jackson was in the case. He immediately called Jackson, who came to his office. There, in Jackson's and Roy's presence, the sheriff played the recording. Roy said he guessed that the voice was his. He did not sign the statement.

Roy Fox's testimony, on *voir dire*, tended to show: If he made any statement or confession to the sheriff "it was not of (his) *knowance*"; that he never sent for the sheriff, that the sheriff put words in his mouth when he was sick and fatigued from lack of sleep; that he had no connection whatever with the murder. The officers refused to tell him why he was arrested and what the charge against him was. From the time he was arrested he told Deputy Sheriff Brooks, Davis, Cunningham, Mitchell, and others that he wanted an attorney, but they refused his repeated requests to call one. Deputy

Sheriff Cunningham told him that McMahan and Arrlie had implicated him "in this murder"; that his wife had been arrested and neither she nor any member of his family would be released until he had signed a statement; that she would wash pans in Raleigh if he didn't, and she said for him to go ahead and tell the truth. Deputy Sheriff Brooks told him he thought that if Roy had not gone into the house he would not be in much trouble and that he should tell what happened. Sheriff Clay said if he would tell the truth he wouldn't get over 30-40 years and would have a chance at a parole; that the sheriff's office could be a lot of help in getting a parole. Deputy Sheriff Gregg, who is related to his sister's husband, said he would help him all he could if he would tell the truth.

At the conclusion of the *voir dire,* the judge found facts which detailed Roy's background and education, previous court experiences, and the treatment he received after his arrest. He also found that on 14 November 1964, after Sheriff Clay had warned him that he did not have to talk and that anything he said might be used against him — and at a time when he was in full possession of his faculties and mentally competent — Roy, "freely and voluntarily, and without threats of violence, promises, or other inducements," made a statement which was recorded and transcribed.

He thereupon overruled defendants' objections to the statement, and it was introduced in evidence as State's Exhibit 42. The transcript discloses no instruction by the court that the jury would consider the statement only as evidence against Roy Fox.

Roy's statement tended to show that Arrlie had represented to the other three defendants that it would be "a push over" to get Lunsford's money and that Arrlie had overpersuaded him to act as chauffeur on the night in question. His report of what Donald and Arrlie told him of events transpiring in the Lunsford house when he picked them up corroborated their statements. Roy's confession also implicated Carson McMahan.

When the State rested its case, Arrlie Fox testified in his own behalf. His account of events leading up to and transpiring at the Lunsford home on 10 November 1964, although given in greater detail, did not vary the statement he had previously given. In addition, Arrlie testified that in early October 1964, at Roy's instance, Arrlie and McMahan had robbed Mrs. Nolan Carson, who operated a small grocery near Weaverville. Roy, who did not participate in the actual robbery, took all this money. In September 1964, while Roy and Donald cruised around in the truck, Arrlie and McMahan had robbed Mr. T. J. Wilson, who ran a store near Burnsville. On another

occasion, Arrlie kidnapped an old man named Bryson, who carried money in his automobile, and took $500.00-$600.00 from him. Roy gave Arrlie "a little of the change to spend along." He also gave Donald some of the Bryson money.

After each defendant had rested, the State offered in evidence two additional statements signed by Carson McMahan (S-52 and S-53), which corroborated Arrlie's testimony with reference to the Carson and Wilson robberies. In each instance, McMahan said they had used a .22 revolver, which Roy had given Arrlie. Each defendant objected to the admission of these statements, and the court restricted the jurors' consideration of them to Carson McMahan only. (These exceptions were abandoned when not brought forward in appellants' briefs.)

*T. W. Bruton, Attorney General; Ralph Moody, Deputy Attorney General; Millard R. Rich, Jr., Assistant Attorney General; and Andrew A. Vanore, Jr., Staff Attorney, for the State.*

*T. E. L. Lipsey for Roy Lee Fox, defendant.*

*John H. Giezentanner for Robert Carson McMahan, defendant.*

SHARP, J.

Each appellant assigns as error the court's denial of his motion for a separate trial. These assignments raise the question whether a defendant, who is jointly indicted with another or others and moves for a severance, has a right to a separate trial when the State will offer in evidence the confession or admission of a codefendant which implicates the movant in the crime charged and is inadmissible against him.

[1]   At the time this case was tried below, we followed the general rule that whether defendants jointly indicted would be tried jointly or separately was in the sound discretion of the trial court, and, in the absence of a showing that a joint trial had deprived the movant of a fair trial, the exercise of the court's discretion would not be disturbed upon appeal. *State v. Battle,* 267 N.C. 513, 148 S.E. 2d 599; *State v. Hines,* 266 N.C. 1, 145 S.E. 2d 363; *State v. Bryant,* 250 N.C. 113, 108 S.E. 2d 128; Annot., Right to severance where codefendant has incriminated himself, 54 A.L.R. 2d 830 (1957). In *State v. Bonner,* 222 N.C. 344, 23 S.E. 2d 45, this Court held that a joint trial had resulted in prejudice to the defendants and ordered a severance. The two defendants were tried jointly under separate bills of indictment for the first-degree murder of Ira L. Godwin. The

State relied for conviction solely upon each defendant's separate confession, which incriminated the other defendant, who had not acquiesced in it. Motions for separate trials were overruled and each was convicted. Upon appeal, this Court held that, despite the court's instructions to the jury to consider a confession only against the maker, the admission of the incriminating statements of one defendant had obviously prejudiced the trial of the other and that at the close of all the evidence the judge should have declared a mistrial and ordered a severance. See *State v. Battle, supra;* 1 Strong, N. C. Index, Criminal Law § 87 (1957).

[2, 3]    Ordinarily, however, the admission of the extrajudicial confession of one codefendant, even though it implicated another against whom it was inadmissible, was held not to be error, *provided* the trial judge instructed the jury that the confession was evidence only against the confessor and must not be considered against another. *State v. Lynch,* 266 N.C. 584, 146 S.E. 2d 677; Stansbury, N. C. Evidence § 188 (2d ed. 1963). In countenancing that rule, the court realized fully that the jury might find it difficult to follow the court's instructions and to put out of their minds those portions of a confession which implicated codefendant(s), yet, after weighing all the circumstances, the court thought that procedure the best solution of the difficult problem, and that it could not assume a jury would ignore the trial judge's instructions. *State v. Kerley,* 246 N.C. 157, 97 S.E. 2d 876. A confession legally obtained is clearly competent against the defendant who made it and the best evidence of his guilt. A severance requires multiple trials on exactly the same evidence, except as to the confessions, and, as in the instant case, the State's evidence frequently warrants an indictment against all the defendants for conspiracy to commit the crimes charged. *State v. Egerton,* 264 N.C. 328, 141 S.E. 2d 515.

The North Carolina rule was also the federal rule. *Delli Paoli v. United States,* 352 U.S. 232, 1 L. Ed. 2d 278, 77 S. Ct. 294 (1957). In *Delli Paoli,* the District Court admitted in evidence the confession of one of two defendants but instructed the jury that it was to consider it only in determining the guilt of the confessor. In affirming the appellant's conviction the Supreme Court of the United States said:

". . . Unless we proceed on the basis that the jury will follow the court's instructions where those instructions are clear and the circumstances are such that the jury can reasonably be expected to follow them, the jury system makes little sense. Based on faith that the jury will endeavor to follow the court's instructions, our system

of jury trial has produced one of the most valuable and practical mechanisms in human experience for dispensing substantial justice.

" 'To say that the jury might have been confused amounts to nothing more than an unfounded speculation that the jurors disregarded clear instructions of the court in arriving at their verdict. Our theory of trial relies upon the ability of a jury to follow instructions.' . . . *Opper v. United States*, 348 U.S. 84." *Id.* at 242, 1 L. Ed. 2d at 286, 77 S. Ct. at 300.

[4]　On 20 May 1968, however, in *Bruton v. United States*, 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620 (1968), the Supreme Court of the United States overruled *Delli Paoli v. United States, supra.* In *Bruton*, the two defendants, Bruton and Evans, were tried jointly in the District Court on a federal charge of armed postal robbery. Evans' confession, which implicated Bruton, was admitted in evidence. Relying upon *Delli Paoli*, the trial judge instructed the jury that Evans' confession was incompetent hearsay against Bruton and should not be considered in determining his guilt or innocence. In reversing the decision of the United States Court of Appeals for the Eighth Circuit, which had affirmed Bruton's conviction, the Supreme Court repudiated the basic premise of *Delli Paoli* and quoted a statement by Chief Justice Traynor in *People v. Aranda*, 63 Cal. 2d 518, 529, 407 P. 2d 265, 271-272 (1965):

". . . A jury cannot 'segregate evidence into separate intellectual boxes.' . . . It cannot determine that a confession is true insofar as it admits that A has committed criminal acts with B and at the same time effectively ignore the inevitable conclusion that B has committed those same criminal acts with A."

Mr. Justice Brennan, delivering the opinion of the Court in *Bruton*, said:

". . . We hold that, because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining petitioner's guilt, admission of Evans' confession in this joint trial violated petitioner's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment. We therefore overrule *Delli Paoli* and reverse.

"* * *

". . . Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect, a fact recognized when accomplices do take the stand and the jury is instructed to weigh their testimony carefully given the recognized motivation to shift blame onto others. The unreliability of such evidence is intoler-

ably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination. It was against such threats to a fair trial that the Confrontation Clause was directed." *Id.* at 126 and 136, 20 L. Ed. 2d at 479 and 485, 88 S. Ct. at 1622 and 1628.

[4, 5]    In *Roberts v. Russell*, 392 U.S. 293, 20 L. Ed. 2d 1100, 88 S. Ct. 1921 (1968), the Supreme Court held that *Bruton* is to be applied retroactively. In *Pointer v. Texas*, 380 U.S. 400, 13 L. Ed. 2d 923, 85 S. Ct. 1065 (1965), it was held that "the Sixth Amendment's right of an accused to confront the witnesses against him is . . . a fundamental right and is made obligatory on the States by the Fourteenth Amendment." *Id.* at 403, 13 L. Ed.. 2d at 926, 85 S. Ct. at 1068. *Bruton*, therefore, is binding upon this Court and controls decision here.

[4, 6]    The result is that in joint trials of defendants it is necessary to exclude extrajudicial confessions unless all portions which implicate defendants other than the declarant can be deleted without prejudice either to the State or the declarant. If such deletion is not possible, the State must choose between relinquishing the confession or trying the defendants separately. The foregoing pronouncement presupposes (1) that the confession is inadmissible as to the codefendant (see *State v. Bryant, supra*), and (2) that the declarant will not take the stand. If the declarant can be cross-examined, a codefendant has been accorded his right to confrontation. See *State v. Kerley, supra* at 160, 97 S.E. 2d at 879.

[4]    In this case, Arrlie Fox testified and was cross-examined by his codefendants. His statement, therefore, did not come within the ban of *Bruton.* However, no other defendant testified, and the confession of each — which implicated all the others — was admitted in evidence over their objections as were the statements of Carson McMahan (S-52 and S-53) with reference to two previous robberies. Thus, the decision in *Bruton* requires that appellants' convictions be set aside and a new trial awarded each of them.

[7]    A new trial requires consideration of the assignments of error by which each appellant challenges the admissibility of his confession. The confessions in question were made in November 1964. Their admissibility therefore is not dependent upon whether McMahan and Fox were given the warnings specified in *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966), decided 13 June 1966; *Johnson v. New Jersey*, 384 U.S. 719, 16 L. Ed. 2d 882, 86 S. Ct. 1772 (1966). The question remains, however, whether they were freely and voluntarily given and whether the officers obtaining the

confessions employed the procedural safeguards then applicable. We consider first the confession of Carson McMahan.

**[8-10]** It has been the law of this State from its beginning that an extrajudicial confession of guilt by an accused is admissible against him only when it is voluntary. *State v. Vickers,* 274 N.C. 311, ...... S.E. 2d ......; *State v. Gray,* 268 N.C. 69, 150 S.E. 2d 1; *State v. Warren,* 235 N.C. 117, 68 S.E. 2d 779; *State v. Roberts,* 12 N.C. 259. When an investigating officer "offers some suggestion of hope or fear . . . to one suspected of crime and thereby induces a statement in the nature of a confession, the decisions are at one in adjudging such statement to be involuntary in law, and hence incompetent as evidence. . . ." (Citations omitted.) *State v. Biggs,* 224 N.C. 23, 26-27, 29 S.E. 2d 121, 123. Whether conduct on the part of investigating officers amounts to a threat or promise which will render a subsequent confession involuntary and incompetent is a question of law, and the decision of the trial judge is reviewable upon appeal. *State v. Biggs, supra.*

**[11, 12]** In this case, the judge found that Officer Cunningham told McMahan that it would be better for him in court if he told the truth; that thereafter on 13 November McMahan made a statement (S-37), and while he was making it he was told that "he might be charged with being an accessory to the crime rather than a principal and this would be a lesser charge"; that on 15 November two other officers who did not know he had made a previous statement, after warning him of his rights, informed McMahan that he could "make a voluntary statement"; that McMahan then made the statement which was introduced in evidence as S-36.

Where the officers merely ask for the truth and hold out no hope of a lighter punishment a defendant's confession is not rendered involuntary by their request for "nothing but the truth." *State v. Thomas,* 241 N.C. 337, 85 S.E. 2d 300; *State v. Thompson,* 227 N.C. 19, 40 S.E. 2d 620; 23 C.J.S., Criminal Law § 817(8) (1961). In *State v. Dishman,* 249 N.C. 759, 107 S.E. 2d 750, the officers told defendant that "it would be better if he would go ahead and tell (them) what had happened." Nothing else was said. The court's conclusion that the defendant's confession was voluntary was upheld. In *State v. Fuqua,* 269 N.C. 223, 152 S.E. 2d 68, however, the officer testified that he told the defendant "if he wanted to talk to me then I would be able to testify that he talked to me and was cooperative." We held that "[t]his statement by a person in authority was a promise which gave defendant a hope for lighter punishment"; that

therefore the defendant's confession was involuntary and incompetent as a matter of law. *Id.* at 228, 152 S.E. 2d at 72.

Here, the implication of Officer Cunningham's statement to McMahan was (1) if he told the truth about the entire matter it would be better for him in court and (2) he might be charged with a lesser offense. Clearly this statement constituted "a suggestion of hope" which rendered his subsequent confessions involuntary. Nothing in the evidence suggests that the first confession (S-37) was any different from the subsequent confession (S-36), or that the promise which influenced the first one had not similarly influenced the second. If the hope of avoiding a murder charge influenced McMahan's first statement, it is improbable that he would have jeopardized that chance by refusing to make the same statement, or by making a different statement, to a second group of officers. "[W]here a confession has been obtained under circumstances rendering it involuntary, a presumption arises which imputes the same prior influence to any subsequent confession, and this presumption must be overcome before the subsequent confession can be received in evidence." *State v. Moore*, 210 N.C. 686, 692, 188 S.E. 421, 425; *accord, State v. Hamer*, 240 N.C. 85, 81 S.E. 2d 193; *State v. Gibson*, 216 N.C. 535, 5 S.E. 2d 717; *State v. Roberts, supra.*

We hold, therefore, that the confession of Carson McMahan was incompetent and that its admission was prejudicial error.

[13] Roy Fox's confession antedated the decision in *Miranda v. Arizona, supra.* In the *Miranda* opinion, it is stated that interrogation of a prisoner who said he desires counsel must cease until he has had an opportunity to confer with an attorney. The question arises, therefore, whether this was the law prior to the *Miranda* decision. In *Massiah v. United States*, 377 U.S. 201, 12 L. Ed. 2d 246, 84 S. Ct. 1119 (1964), it was held that incriminating statements elicited by government agents from the defendant after he had been indicted and in the absence of his attorney were not admissible at his trial. *Escobedo v. Illinois*, 378 U.S. 478, 12 L. Ed. 2d 977, 84 S. Ct. 1758 (1964), extended this right to the presence of counsel to the time an accused is taken into custody. In *Escobedo*, the statement of a defendant, who had not been effectively warned of his constitutional right to remain silent and whose attorney had been forcibly kept from him, was held to be inadmissible in evidence against him.

Roy had been fully advised of his right to remain silent and to have counsel. Notwithstanding this distinction (and others which might be made between this case and *Escobedo*), if, after requesting an attorney, Roy was not given an opportunity to confer with him

STATE v. FOX

prior to making his confession, it is our opinion that *Massiah* and *Escobedo* dictate a holding that his incriminating statements are not admissible in evidence against him. As pointed out in *Collins v. State* (Fla.), 197 So. 2d 574, *cert. denied*, 207 So. 2d 430 (Fla. 1968), a case involving this question, the Supreme Court said in *Miranda* that it based its decision upon cases it had previously decided:

. "[W]e start here, as we did in *Escobedo*, with the premise that our holding is not an innovation in our jurisprudence, but is an application of principles long recognized and applied in other settings. We have undertaken a thorough re-examination of the *Escobedo* decision and the principles it announced, and we reaffirm it. That case was but an explication of basic rights that are enshrined in our Constitution — that 'no person . . . shall be compelled in any criminal case to be a witness against himself' and that 'the accused shall . . . have the assistance of counsel.' " *Miranda v. Arizona*, *supra* at 442, 16 L. Ed. 2d at 705, 86 S. Ct. at 1611.

. *People v. Blanchard*, 37 Ill. 2d 69, 224 N.E. 2d 813 (1967), also involved a crime which antedated *Miranda*. Relying upon *Escobedo*, the Illinois Supreme Court held the defendant's confession inadmissible because made in the absence of counsel after a request which had not been withdrawn. It disposed of the State's contention that the officers to whom the confession was made did not know that defendant had requested counsel by upholding that the "interrogating officers" were charged with the same knowledge which the "escorting deputies" had. "To hold otherwise," the Court said, "could make it possible to nullify an accused's request for the assistance of counsel by the expedient of transferring his custody for questioning to an officer who would be unaware of the request for an attorney." *Id.* at 73, 224 N.E. 2d at 813, 816. See Annot., Accused's right to assistance of counsel at or prior to arraignment, 5 A.L.R. 3d 1259 (1966).

[14] In passing upon the admissibility of Roy's confession it is necessary to ascertain whether he had been denied the assistance of counsel at the time of the interrogation which produced his confession. The State's evidence tends to show that shortly after his arrest Roy said that he did not want counsel; that thereafter he voluntarily made his confession to Sheriff Clay without telling him he desired counsel; that he first requested an attorney after he had made his confession. Roy's evidence tends to show that he requested counsel immediately after his arrest on Friday afternoon, 13 November; that, despite his continuous requests thereafter, Mr. Jackson was not called until Saturday, 14 November; that, when Jackson came to the jail in response to the call, he was informed that the sheriff was talk-

ing to Roy; that he waited and, in about fifteen minutes, Roy was brought up from the sheriff's office.

Although the evidence as to when Roy requested an attorney was sharply conflicting, the court's findings of fact omit any reference to this request, the time Mr. Jackson was called, and when he came. In a case such as this, after the preliminary inquiry into the circumstances surrounding the making of a confession, "the approved practice requires that the judge, in the absence of the jury, make findings of fact. These findings are made to show the basis for the judge's decision as to the admissibility of the proffered testimony." *State v. Conyers*, 267 N.C. 618, 621, 148 S.E. 2d 569, 571-72, Accord, *State v. Clyburn*, 273 N.C. 284, 159 S.E. 2d 868; *State v. Gray, supra; State v. Barnes*, 264 N.C. 517, 142 S.E. 2d 344.

If Roy voluntarily made the statement (S-42), or the earlier one which was not transcribed, and *thereafter* requested counsel for the first time, he was not deprived of his Sixth Amendment right to counsel. If, however, *after* he had requested an attorney, and *before* he was given an opportunity to confer with him, officers continued to interrogate Roy, any incriminating statement thus elicited cannot be received in evidence against him. The ruling upon the admissibility of any statement which Roy may have made must await the findings of material facts to be made by the judge at the next trial.

New trial.