STATE OF NORTH CAROLINA v. BENJAMIN F. HOLMES AND BERNARD PENN

No. 8921SC525

(Filed 15 May 1990)

### 1. Criminal Law § 83 (NCI3d) — statements to wife — procurement of gun — privileged confidential communications

Statements made by defendant to his wife that he was going to shoot and kill the victim because he had messed up his money and defendant's actions in taking a gun from a kitchen cabinet in his wife's presence constituted confidential communications within the meaning of N.C.G.S. § 8-57(c) where defendant had instructed two other men to go outside the house because he wanted to talk to his wife before he made the statements and procured the gun. Therefore, defendant had the right to prohibit his wife from testifying both about his statements to her and his actions in procuring the gun.

**Am Jur 2d, Witnesses § 149.**

### 2. Criminal Law § 83 (NCI3d) — husband-wife privilege — intent to commit crime — similar communications

The privilege of a confidential communication between marriage partners is not removed because the communication shows the intention of one spouse to commit a crime or because the same or a similar communication was made to third persons on other occasions.

**Am Jur 2d, Witnesses § 149.**

### 3. Criminal Law § 74.2 (NCI3d) — codefendant's incriminating statements — acting in concert — Bruton rule inapplicable

A codefendant's statements to the police which primarily implicated himself and did not refer to defendant were not inadmissible in defendant's trial under the *Bruton* rule because defendant was tried under the theory of "acting in concert."

**Am Jur 2d, Evidence § 539.**

### 4. Criminal Law § 74.3 (NCI3d) — defendant's statements — deletion of statements about codefendant — defendant not prejudiced

A defendant charged with murder was not prejudiced when the trial court sanitized his statements to a witness

STATE v. HOLMES

[101 N.C. App. 229 (1990)]

under the *Bruton* rule by deleting a statement that a codefendant fired the first two shots and admitting only the statement that defendant fired the third shot because he did not want the victim to suffer where a pathologist had previously testified that the victim had been shot three times, other testimony clearly alleged that the codefendant had fired some if not all the shots, and the deletion did not materially change the nature of defendant's statements to the witness. N.C.G.S. § 15A-297(c)(1).

**Am Jur 2d, Evidence § 540.**

5. **Criminal Law § 74.2 (NCI3d)— defendant's statements incriminating codefendant—exclusion under Bruton rule—hearsay**

The trial court correctly prevented a witness from testifying about what defendant said he had seen the night the victim was shot since, following the purpose of the *Bruton* rule, a codefendant had the right to demand protection from being incriminated by defendant's admissions, and since the testimony was hearsay.

**Am Jur 2d, Evidence § 540.**

6. **Homicide § 21.7 (NCI3d)— second degree murder—acting alone or in concert—sufficiency of evidence**

The State's evidence was sufficient to support defendant's conviction of second degree murder either under the theory that defendant acted alone or under the theory that he acted in concert with a codefendant where it tended to show that defendant and the codefendant picked up the victim on the morning of the murder and those three were together virtually the entire day; the victim had been shot three times, and defendant admitted to a witness that he had shot the victim one time; defendant smoked Kool cigarettes and a Kool cigarette butt was found close to the victim's body; and defendant told his sister-in-law that he had killed the victim.

**Am Jur 2d, Homicide §§ 425, 426.**

7. **Criminal Law § 793 (NCI4th)— acting in concert—refusal to instruct on causation—no error**

The trial court did not err by refusing defendant's request for a special instruction regarding the issue of causation on the theory of acting in concert.

**Am Jur 2d, Homicide § 476.**

**STATE v. HOLMES**

[101 N.C. App. 229 (1990)]

APPEAL by defendants from judgment entered by *Judge James A. Beaty, Jr.*, in FORSYTH County Superior Court. Heard in the Court of Appeals on 16 January 1990.

Defendant Bernard Penn and co-defendant Benjamin Holmes were indicted for the murder of "Danny Boy" Hooper. The cases came on to be joined and tried together over Penn's objection on 12 December 1988. The State sought second-degree murder convictions and the defendants pled not guilty. A jury found both defendants guilty as charged. At sentencing Judge Beaty found aggravating factors against both defendants and sentenced each to fifty years imprisonment. Defendants appealed.

At trial the State presented the following evidence:

Theodore Tolliver testified that on the morning of 11 January 1988, the victim Hooper was in a liquor house that he ran in Winston-Salem, North Carolina. At about 11:30 a.m., defendants Penn and Holmes drove up to the house. Penn was driving and Holmes was riding in the front seat. Penn got out of the car, announced that he wanted to see Hooper and went inside the house. About forty minutes later, Penn came outside with Hooper and tried to persuade Hooper to get into the car. A bystander named Edward Johnson approached the car, but Penn said he did not want Johnson to go with them. Hooper got in the back seat and Penn drove off. Co-defendant Holmes did not get out of the car or say anything during this time. Johnson testified and confirmed Tolliver's testimony.

Martha Hairston also substantially confirmed Tolliver's testimony. Hairston, who was Hooper's girlfriend, testified that she was inside the liquor house on 11 January when Penn entered. As Hooper left with Penn, Hairston gave Hooper some money and asked him to buy a package of Newport cigarettes.

The State then called Debra Penn, Penn's wife and the sister of Holmes. She testified that at about 3:15 p.m. on 11 January, Penn, Holmes and Hooper came into her house where she, Penn, and their children lived. Hooper used the telephone. Then Penn told both Holmes and Hooper "to go outside—step out on the porch, that he wanted to talk to [Debra] about something." After the men left, Penn reached in a cabinet and took out a gun. At this point in Debra's testimony, Penn objected and asserted his statutory and common law privilege to prevent his wife from testifying about confidential communications that occurred during their marriage. The trial court excused the jury and held a *voir dire*

STATE v. HOLMES

[101 N.C. App. 229 (1990)]

to determine if the communications constituted a privileged confidential communication. The court allowed the testimony over objection, and Debra testified that Penn told her that he "was going to shoot and kill the guy, Danny Boy, because he had messed up his money." Debra further testified that Penn wrapped the gun in a sweater and left with the others at about 3:40 p.m. She stated that Penn came home at about 11:30 p.m. on 11 January. Debra admitted that she told police an entirely different story on 13 January. Debra also testified that her brother Holmes smoked Kool cigarettes.

Luther Ijames testified that he lived in an apartment complex off Mineral Avenue in Winston-Salem, that he was driving home from work after 7 a.m. on 12 January 1988 and that he spotted Hooper's body lying on the ground in a wooded area off Mineral Avenue. Ijames had not seen the body when he drove by at 10:30 p.m. the night before.

Winston-Salem policeman Ken Bishop testified that he found Hooper's body in some woods off Mineral Avenue about fifteen feet from the street. A number of houses and apartments are within about fifty yards of the point where the body was found. Bishop found Hooper's jacket lying on some branches about thirty feet from the body, a Kool-brand cigarette butt about five feet from the body and open and unopened packages of Newport cigarettes in Hooper's pockets. Two .38 caliber half copper-jacketed lead hollow point bullets were removed from Hooper's body at the autopsy. Bishop testified he found similar bullets in a teapot and drawer when he searched Penn's house on 13 January 1988. The officer said that a .38 caliber handgun would make a "significantly loud noise" when fired, which could be heard from at least 200 yards.

Winston-Salem policeman W.C. Crump testified that police canvassed the area and found no one who heard any gunshots or who knew when the body was put there. Crump said he searched Penn's car on 13 January and found no blood but did find Newport cigarette butts in the rear ashtrays.

A pathologist testified that there were three gunshot wounds to the victim's body, two in the left chest and a third in the left side of the face. One shot to the chest penetrated the heart and was the cause of death and the other chest shot nicked the heart and was "potentially fatal." The shot to the face was not potentially fatal.

STATE v. HOLMES

[101 N.C. App. 229 (1990)]

The remaining evidence from the State consisted of testimony regarding admissions made by the defendants. Jerry Galloway testified that Penn came to his house about 9:00 a.m. on 12 January "seeking an alibi." Penn said he had shot Hooper three times because the victim had "fucked up" $1,200 or $12,000 worth of his dope. Galloway testified that Penn told him that "he shot the boy twice in the upper chest and once in the head." Galloway and Penn talked about evidence. Penn then made a telephone call and told the person on the line to get all the bullets out of the house and get rid of them. Penn then reiterated that he had to get an alibi and left.

Elijah Moses testified for the State about a statement that co-defendant Holmes allegedly made to him on the night of 11 January. Holmes immediately objected to this testimony and the trial court excused the jury. Holmes stated he had received notice of the contents of the statement allegedly made to Moses. The statement Holmes allegedly made to Moses was: "Penn fired the first two shots and then he (Holmes) fired the third shot because he didn't want him (Hooper) to suffer." The trial court ordered the statement "sanitized" under the *Bruton* rule, and the prosecutor was allowed to ask Moses the following question: "Did Holmes tell you that he shot Hooper one time and he shot him because he did not want him to suffer?" Over objections from both defendants, Moses replied, "Yeah."

Defendant Holmes testified that he was a cocaine addict and that he sold cocaine for Penn. Holmes said he was afraid of Penn and depended on Penn to supply him with drugs. Holmes stated that on the morning of 11 January Penn drove the two defendants to Tolliver's, got out of the car, returned in fifteen minutes with Hooper, got in the car with Hooper, drove off and then asked Hooper, "have you got my money?" Penn drove the three men around rural Forsyth County for several hours, stopped at three houses and a convenience store and talked with Hooper about cocaine and money. Holmes did not recall stopping at Penn's house. When it began to get dark, Penn told Holmes to drive. Penn got in the front seat and gave Holmes directions to Mineral Avenue. After they arrived at Mineral Avenue, Holmes cut the car off, heard Penn talking to Hooper inside the car and then he heard a shot. Holmes jumped out of the car, looked around and saw Hooper fall out of the back seat of the car onto the street. Penn then dragged the victim into the woods. Hooper was moaning and

Penn shot Hooper again. Holmes and Penn got back in the car, circled the block and saw that Hooper had moved about four feet. Penn got out of the car and shot Hooper again. Penn then dropped Holmes off at Moses' liquor house, where he drank some wine, used some drugs and then told Moses what had happened. Holmes testified that he did not mention Penn's name to Moses and did not tell Moses that he fired a shot to put Hooper out of his misery.

Penn did not put on any evidence. He only called co-defendant Holmes' sister-in-law Geraldine Holmes who testified that on 12 January Holmes told her that he killed the victim. Holmes rebutted this testimony by calling his mother Willa Mae Holmes. She testified that on 12 January Holmes told her and Geraldine Holmes not that he had killed the victim, but that he knew who killed Hooper.

*Attorney General Lacy H. Thornburg, by Assistant Attorney General Mabel Y. Bullock, for the State.*

*Crawford and Hough, by David R. Crawford and William A. Hough, III, for defendant appellant Holmes.*

*Appellate Defender Malcolm Ray Hunter, Jr., by Assistant Appellate Defender Daniel R. Pollitt, for defendant appellant Penn.*

ARNOLD, Judge.

## I. Penn's Assignments of Error

[1] Defendant Penn first assigns error to the trial court's admission into evidence of a privileged confidential communication between him and his wife in violation of N.C. Gen. Stat. § 8-57(c). He argues this violation was reversible error. We agree. N.C. Gen. Stat. § 8-57(c) provides that in criminal cases, "[n]o husband or wife shall be compellable in any event to disclose any confidential communication made by one to the other during their marriage." The North Carolina Supreme Court has held that "spouses shall be incompetent to testify against one another in a criminal proceeding . . . if the substance of the testimony concerns a 'confidential communication' between the marriage partners made during the duration of their marriage." *State v. Freeman*, 302 N.C. 591, 596, 276 S.E.2d 450, 453 (1981). This rule was recently reiterated: "[W]e have said that a spouse's testimony is . . . incompetent if the substance of the testimony concerns a confidential communication." *State v. Britt*, 320 N.C. 705, 709 n.2, 360 S.E.2d 660, 662 (1987). The privilege rendering a spouse incompetent to testify about the

other spouse's confidential marital communication is a rule of longstanding and wide acceptance. *See* 1 Brandis on North Carolina Evidence § 60 (3d ed. 1988).

To fall within the purview of this privilege, the communication must have been made confidentially between wife and husband during the marriage. *Freeman,* 302 N.C. 591, 276 S.E.2d 450. The test for a confidential communication is "whether the communication, whatever it contains, was induced by the marital relationship and prompted by the affection, confidence, and loyalty engendered by such relationship." *Id.* at 598, 276 S.E.2d at 454.

In the case *sub judice,* when the State called Penn's wife as a witness, Penn immediately objected and asserted his privilege. Over his objection, Debra Penn testified that on 11 January she was at home when Penn, Holmes and Hooper arrived. After a few minutes, Penn instructed the two other men to go outside the house because he wanted to talk to his wife about something. After the two men left and she and Penn were alone, her husband reached into a kitchen cabinet and took out a gun. Penn then told her that he was going to shoot and kill Hooper because Hooper had messed up some of his money. He wrapped the gun in a sweater and left.

In contrast, in *Freeman* the potential witness spouse stipulated that had she been allowed to testify she would have stated that the defendant, her husband, drove into a public parking lot where she was sitting in another car with her brother. The husband left his car and approached the car with the wife and brother inside. The husband asked if either of them wished to speak with him and then immediately discharged the shotgun, killing the brother. At trial the defendant husband objected to the wife's testimony concerning the events that transpired in the parking lot on the grounds that his comments and actions were confidential communications. Nevertheless, the court held that the witness spouse's testimony was competent and admissible. "Such actions in a public place and in the presence of a third person could not have been a communication made in the confidence of the marital relationship or one which was induced by affection and loyalty in the marriage." *Freeman,* 302 N.C. at 598, 276 S.E.2d at 455; *accord, State v. Funderburk,* 56 N.C. App. 119, 286 S.E.2d 884 (1982).

In the case before us, Penn asked the third parties to leave before he spoke to his wife in their home. Penn's communications

were made to his spouse during the duration of their marriage and they were made in confidence. Debra testified that Penn trusted her when he made the communications. No evidence was offered that anyone overheard the communications. All the circumstances here show that Penn's statements were induced by the confidence of his marital relationship and thus were protected. *See Hicks v. Hicks*, 271 N.C. 204, 155 S.E.2d 799 (1967).

Generally, the privilege of a confidential communication extends only to utterances and not to acts. 8 Wigmore, *Evidence* § 2337 (McNaughton rev. 1961). Nevertheless, an action may be protected if it is intended to be a communication and is the type of act induced by the marital relationship. 97 C.J.S. Witnesses § 269 (1957). In this case, Penn told Holmes and Hooper to leave before he took the gun out of the cabinet. Penn could have asked his wife to leave the room or secured the gun at another time if he had not wished her to see his actions. The facts here lead us to conclude that Penn acted in front of his wife out of a feeling of trust induced by their marriage relationship. We hold that Penn had the right to assert the privilege against Debra and prohibit her from testifying both about his statements to her and about his actions in procuring the firearm.

[2]  In an order allowing the wife's testimony, the trial court stated that it allowed Debra to testify because Penn's conversation with his wife was "an expression of his intent to commit a criminal act." The court also justified the testimony by categorizing the conversation as corroboration. However, there is no support in the law for either of these positions. It is well settled that if the requirements of a confidential communication exist, the privilege is not removed where the communication shows the intention of one spouse to commit a criminal offense. Specifically, "[t]he rule excludes testimony by a wife of threats of her husband, made to her alone, that he would kill a third person . . . ." 97 C.J.S. Witnesses § 269 (1957). Neither is the privilege removed by the fact that the same or similar communications were made to third persons on other occasions. 97 C.J.S. Witnesses § 272 (1957); *Koon v. State*, 10 Fla. L. Week 49, 463 So.2d 201, *cert. den.*, 472 U.S. 1031, 87 L.Ed.2d 641 (1985).

Finally, evidence rendered incompetent by N.C. Gen. Stat. § 8-57 is excludable and failure to do so is reversible error. *See*

*Freeman*, 302 N.C. 591, 276 S.E. 2d 450. Therefore, we are required to grant defendant Penn a new trial.

As will be made clear below, it is not necessary to address Penn's other assignment of error.

## II. Holmes' Assignments of Error

Co-defendant Holmes first assigns error to the trial court's admission of several out-of-court statements made by Penn that tended to incriminate and implicate him. The statements that Holmes contends were erroneously admitted include Penn's statement to his wife that he was going to shoot and kill Hooper and several other statements Penn made to the police after the shooting tending to show that he was trying to cover up the crime.

[3] As to the first statement, Holmes made no objection to this testimony at trial, and we will not consider an objection to the admission of evidence that is made for the first time on appeal. Concerning the other statements he objects to, we are unpersuaded by Holmes' argument here because these statements do not refer to him. While Holmes concedes that the statements primarily implicate Penn, he contends they indirectly implicate him because he was tried under the theory of "acting in concert." We disagree. We fail to see any prejudice toward Holmes in admitting these statements. This is an attempt by defendant to stretch the principle underlying the *Bruton* rule much farther than is plausible. *See infra.* This assignment of error is dismissed.

[4] Holmes' next three assignments of error center around the testimony and cross-examination of the witness Elijah Moses. On the night of 11 January 1988, Penn dropped Holmes off at Moses' drink house. Holmes made certain statements of what had transpired that night, which Moses later reiterated to the police. The essence of the statements was that Holmes had told Moses that Penn fired the first two shots and that he (Holmes) fired the third shot because he did not want Hooper to suffer. Under the *Bruton* rule, the court ruled admissible only the portion of the statement in which Holmes said that he fired the third shot because he did not want Hooper to suffer. *See Bruton v. United States*, 391 U.S. 123, 20 L.Ed.2d 476 (1968). *Bruton* holds that a defendant's sixth amendment right to confront witnesses against him is violated if he is implicated by the confession of a co-defendant being tried with

him who does not testify. *Bruton* has been codified at N.C. Gen. Stat. § 15A-927(c)(1).

The rule requires the exclusion of extrajudicial statements of a defendant which tend to incriminate another defendant unless the portions incriminating the nondeclarant defendant can be deleted "without prejudice either to the State or the declarant." *State v. Fox*, 274 N.C. 277, 291, 163 S.E.2d 492, 502 (1968). Holmes contends that the admission of the redacted statement was erroneous because elimination of the portion of the statement attributing the first two shots to Penn distorted the statement and left Holmes to appear to have acted more egregiously than had the entire admission been allowed into evidence.

*State v. Giles* involved a situation where the trial court complied with *Bruton* and N.C. Gen. Stat. § 15A-927(c)(1) in that defendant's statement was sanitized by deleting all references to a co-defendant before the statement was admitted into evidence against the declarant defendant. *Giles*, 83 N.C. App. 487, 350 S.E.2d 868 (1986), *rev. denied*, 319 N.C. 460, 356 S.E.2d 8 (1987). In *Giles* we held the deletions did not materially change the nature of the statement and that the admission of the sanitized version did not prejudice the defendant. *Id.* at 494, 350 S.E.2d at 872.

The trial court below allowed Moses to testify that Holmes told him that he (Holmes) shot Danny Boy once so the victim would not suffer. Previous to Moses' testimony, evidence had been presented by a pathologist that the victim had been shot three times. Other testimony in the trial clearly alleged that defendant Penn had fired some if not all the shots. As in *Giles*, we fail to see how the deletions here materially changed the nature of defendant Holmes' statement. This assignment of error is overruled.

In a related argument, Holmes contends that the trial court erroneously permitted the prosecutor to ask Moses a leading question concerning Holmes' admission. The prosecutor asked Moses, "Did Holmes tell you that he shot Hooper one time and he shot him because he did not want him to suffer?" Moses replied, "Yeah." The use of leading questions on direct examination is a matter entirely within the discretion of the trial judge, and such a ruling is not reviewable on appeal absent a showing of abuse of discretion. *State v. Riddick*, 315 N.C. 749, 340 S.E.2d 55 (1986); N.C. Gen. Stat. § 8c, Rule 611(c). Furthermore, when this issue arose at trial, defendant's counsel participated in a bench conference concerning

the court's approval of a sanitized version of the statement. In order to protect defendant Penn, the judge ordered that the sanitized portion of the statement be read directly to the witness. This effort was consistent with the principle behind the *Bruton* rule, and in doing so, the judge did not abuse his discretion in allowing the use of the leading question. The assignment of error is overruled.

[5] In another related assignment of error, Holmes contends that the court went too far in protecting Penn when it precluded Holmes from cross-examining Moses about what Holmes contends he actually said to Moses. On cross-examination of Moses, Holmes' attorney sought to elicit testimony that Holmes had actually told Moses that he (Holmes) had witnessed a murder and had asked Moses for money to buy drugs because he was so shook up by what he had seen. The court sustained an objection to the following question asked of Moses: "He (Holmes) asked you (Moses) for that money so he could buy drugs because he was so shook up about what he had seen. Is that not true?" The objection made was sustained as to what Holmes had seen. Defendant Holmes' attorney then asked, "Well, didn't he ask you to borrow money so he could do some drugs because he was shook up?" The objection to this question was overruled. Holmes contends the court's action unduly restricted his ability to confront witnesses against him as guaranteed by the sixth amendment of the United States Constitution. He claims the restrictions compelled him to take the stand to accomplish what he had been forbidden to do on cross-examination.

The longstanding rule in this jurisdiction is that the scope of cross-examination is largely within the discretion of the trial judge, whose rulings thereon will not be held in error absent a showing that the verdict was improperly influenced by the limited scope of cross-examination. *State v. Woods*, 307 N.C. 213, 297 S.E.2d 574 (1982). Defendant makes no showing that the verdict here was improperly influenced by the trial court's actions. The court correctly prevented Moses from testifying about what Holmes said he had seen that night. Again, following the purpose of the *Bruton* rule, Penn had the right to demand protection from incriminations that might arise from admissions made by Holmes. Furthermore, as Holmes admits in his brief, testimony from Moses about what Holmes said he had seen on the night of the shooting was hearsay. The court then overruled an objection to the second question asked of Moses that didn't Holmes ask him (Moses) for money so he

could buy drugs because he was shook up. Moses gave a somewhat unclear answer, but instead of following up to clarify, Holmes' attorney switched his focus and immediately began to attack Moses' credibility. Therefore, this assignment of error is also overruled.

[6] Holmes next contends that the court below erred by denying his motion to dismiss because the State failed to present substantial evidence with respect to each essential element of the crime charged. In a criminal action, the evidence is considered in the light most favorable to the State. Discrepancies and contradictions therein are disregarded and the State is entitled to every inference of fact which may be reasonably deduced therefrom. *State v. Witherspoon*, 293 N.C. 321, 237 S.E.2d 822 (1977). The State presented the following inculpatory evidence against the co-defendant: (1) Holmes was with Penn when they picked up the victim on the morning of the murder, and he was with Penn and Hooper virtually that entire day; (2) Holmes admitted that he was at the scene of the shooting; (3) Holmes smoked Kool cigarettes and a Kool cigarette butt was found very close to the victim's body; (4) Holmes admitted to Moses that he had shot the victim one time; and (5) Geraldine Holmes testified that Holmes told her that he killed the victim.

After the presentation of the evidence, the court instructed the jury that as to defendant Holmes it should return a verdict of guilty if it found that Holmes either acting alone had intentionally and with malice killed the victim, or if Holmes acting "in concert" with defendant Penn had killed the victim. Then as part of its instruction on the theory of acting in concert, the court gave the following instruction: "If two or more persons act together with a common purpose to commit second degree murder, each of them is held responsible for the acts of others done in the commission of second degree murder." We find ample evidence in the record to support defendant's conviction for second degree murder under either theory submitted to the jury. By his own admission, defendant Holmes was at the scene of the shooting and two people testified that Holmes admitted shooting the victim. This assignment of error is overruled.

[7] Next defendant Holmes contends that the trial court erred by refusing his request for a special instruction regarding the issues of causation on the theory of acting in concert. In requesting this special instruction, defendant's counsel cited a case to the trial

STATE v. HOLMES

[101 N.C. App. 229 (1990)]

judge that involved the theory of accessory before the fact. Defendant's argument here is misplaced. The case cited is not applicable in this situation. We noted above the court's instruction to the jury concerning the theory of acting in concert. This instruction was correct. *See State v. Ferrell and State v. Workman*, 46 N.C. App. 52, 264 S.E.2d 134 (1980); Strong's North Carolina Index 4th Criminal Law § 793 (1989).

We have examined defendant Holmes' other assignments of error and found them to be without merit. They are overruled.

In summary, we order a new trial for defendant Penn, but find no error in the trial of defendant Holmes.

Chief Judge HEDRICK and Judge WELLS concur.