STATE v. JAMES BYERS.

*Homicide; burden on accused to show mitigating circumstances— Evidence; of relatives and associates, received with caution— Manslaughter.*

1. When killing with a deadly weapon is proven, or admitted by the prisoner, the burden of showing mitigating circumstances is on the prisoner, who must prove them, not by preponderance of testimony, or beyond a reasonable doubt, but to the satisfaction of the jury. If the jury are left in doubt, as to the mitigating circumstances, the case is murder.

2. Where a prisoner and his relatives, or an associate in the crime, testify on behalf of the prisoner, the law directs the jury to scrutinize their testimony carefully, because of their interest in the result; and the Judge may so caution the jury, although a failure so to do is not assignable as error.

3. On a trial for murder, the evidence introduced by the State showed, that the prisoner was asked by the deceased, if the prisoner did not have a man, who was with him, under arrest; whereupon, the prisoner immediately shot the deceased twice, and killed him. The evidence, on behalf of the prisoner, showed that deceased met the prisoner in the road, called him a damned horse thief, and at the same time dropped the muzzle of a loaded rifle upon prisoner's bowels; that prisoner caught the rifle and endeavored to wrench it from deceased, but did not succeed; that all during the scuffle deceased was trying to shoot the prisoner; that, not being able to disarm the deceased, the prisoner shot him twice with a pistol, and killed him. The Court instructed the jury, that there was no element of manslaughter in the case as disclosed by the evidence; that if the State's evidence was believed, the prisoner was guilty of murder; if the evidence offered by the prisoner was believed, he was guilty of nothing; *Held*, that this charge was correct and proper.

Indictment for murder, tried before *Clark, J.,* and a jury, at March Term, 1888, of Wilkes Superior Court.

The facts are set out in the opinion.

*Attorney General,* for the State.

No counsel for the defendant.

SMITH, C. J.   The prisoner, and one James Stone, are charged in the indictment with the crime of murder, committed upon the body of Henry Edwards, and upon the arraignment of the prisoner, who alone was on trial, he entered the plea of not guilty.   He was convicted by the verdict of the jury of the crime imputed, and, from the judgment of death pronounced, after an ineffectual application for a new trial by his counsel, appeals to this Court.   Two witnesses, present at the killing, were examined by the Solicitor, and gave evidence of the manner in which it was done, and it is, in substance, as follows :

B. F. Tugman testified, that on the morning of August 25, 1886, as he was on his way to the house of a neighbor to get a hog he had traded for, he met the deceased, who, as he was told by him, was going to D. M. Hall's (he being a Justice of the Peace), to obtain a process, which would enable him to get possession of a mule belonging to the prisoner, and which prisoner's wife was riding on a visit to some of her relations in the county; that he had been requested by the wife of one Lon Wyatt, to get and hold the mule until the prisoner returned a horse, which, on the morning before, the prisoner had borrowed of her husband and not sent back, as he had promised ; that proceeding on their way, they passed by the tobacco field of one William H. Key, who, having finished his work, at the request of the witness, went with him after the hog, and all three proceeded to the house of witness' grandfather, and got dinner, and started home; that they stopped at the house of the Justice, which was on their return route, and, while there, learned from the mail carrier that the prisoner had been arrested, and was at Lon Wyatt's, and the horse had been recovered ; that the deceased thereupon said he would go home, and they all left

100—33

and went in the direction of home, the deceased carrying a rifle gun on his shoulder, which he had not fired since they came together; that some half mile from the house of Hall, as they passed up a hill, the road there running a north and south course, they saw a man about 100 yards distant coming down the hill meeting them, who was not known to any one of them; that, as they approached each other, the deceased walking in the middle with his gun on his shoulder, witness remarked, "yonder comes a man, maybe he comes from across the mountain, and can tell us whether Wyatt has got his horse back and they have got a man under arrest;" that as they met said man, one of the party said, "howdy," and they all said the same, whereupon deceased said to the prisoner, "Did you come by Lon Wyatt's?" and the prisoner answered, "I did," when deceased further inquired if they had a man there under arrest? to which prisoner replied: "What in the hell have you got to do with it?" drew his pistol and fired at the deceased as the words escaped his lips; that when the pistol went off the deceased was standing on the west side of the road, facing prisoner, with his gun on his shoulder, offering no violence to him whatever; that deceased, as soon as shot, slapped his right hand to his breast and staggered backwards, when witness and Key ran, and soon heard, when but a few steps off, the report of another shot; that returning they found the deceased lying on the lower side of the road upon his face, his feet stretched out, and his head pointing west, life extinct, and his gun under his body; that witness and Kee went immediately back to Hall's house, detailed the facts to him, and asked for a warrant of arrest; but as they could not give the name of the man who did the act, it was not issued.

The testimony of Key was, in substance, the same as that of Tugman, and that of several other witnesses, introduced by the State, corroborative of what these witnesses swore as to antecedent matters.

It was also in proof, from one D. F. Long, that he met the prisoner and Stone between 1 and 2 P. M. of the day of the homicide, going in the direction of the place where it occurred, and prisoner seemed to be very mad, told him the circumstances about his having the horse, and Edwards going after his mule, and inquired if witness had met him, at the same time giving a description of the person of these men, and representing the deceased as "a thick set, chunky man, with red beard and hair," and he asked witness several times "what he would do in a case like that?" The witness said he would let the law take its course, and repeated the same when again asked, as prisoner left, and before being out of sight, he replied to the remark, "Oh, you are all right," and continued on.

A. P. Myers swore to his meeting with Stone and the prisoner about 2 p. m., about a half a mile from the place of the homicide, and was asked if he had heard of deceased passing, and answered that he had, and that prisoner then said, "that is spitting fire," and went out.

It is not necessary to give more of the evidence of the State, or in greater detail.

The prisoner, for himself and in his defence, said that he spent the night preceding the homicide at the house of his brother-in-law, James Stone; that two nights, before, he had borrowed the horse from Wyatt, intending to return it that evening, but went to one Bowers' house on business, and remained there all night; that next morning he went to Stone's house, where he met Wyatt and the men who came after the horse, and delivered him to Wyatt, paying him one dollar for the trouble of coming after the horse; that, after dinner, at Stone's house, he and witness started across the mountain to meet their respective wives; that witness was not very mad, but was not in good humor; when being near the house of Hall, three men were seen coming abreast, one of whom punched the man in the middle with the gun,

saying, " this is our man;" that as witness drew near, he said, " howdy," and turned to the left, and as witness did so, the man in the middle asked him if he came by Lon Wyatts, and when witness answered that he did, called witness a damned horse thief, at the same time dropping the muzzle of his gun upon witness' bowels, whereupon the latter caught the barrel in both hands and tried to wrench it away, but could not succeed, the man trying all the time to shoot witness; that, about this time, witness thought of his pistol, and while holding the gun with one hand, got the pistol out with the other and shot him; that the man, who was the deceased, began to weaken, when a second shot was fired, and he fell on his right side. After the first shot, the men with him fled; that he did not hear the rifle discharge, and went on towards Hall's house, and, after passing it, met Stone's wife and told her what had occurred, and that he "never wanted to have to do this in this world, and had killed a man in self-defence, God knew."

The other witnesses, his sister Julia Stone, Mrs. Buck Bangers, a daughter of prisoner's wife, and his wife, confirmed the prisoner's account of the occurrence, as now testified, and one of them represented him as weeping when he told of it.

There was no exception to the evidence, but there was to the refusal to give the instruction requested for the prisoner, and to the charge as given.

Instructions asked and refused :

1. When there is no malice, there could be no crime of murder.

2. Though, when the killing is proved or admitted to have been done with a deadly weapon, the law presumes malice, still if, at the time the prisoner fired the fatal shot, the deceased had assaulted the prisoner with the gun, and the prisoner had reason to believe and did believe, that he was about to receive great bodily harm at the hands of the deceased, the case would be one of excusable homicide.

Instructions asked and given:

3. If the deceased had assaulted the prisoner with the gun and was attempting to shoot him, then the shooting by the prisoner, in resisting the felonious onset, would be justifiable.

4. If they met suddenly and unexpectedly, and a sudden altercation ensued, and in it the prisoner slew the deceased, the offence would be manslaughter.

The Court said to the jury, among other things, that there was no element of manslaughter in the case, and the offence was murder, or no crime; that if the jury believe the evidence offered for the State, the prisoner is guilty of murder, while if they believed that offered for the prisoner, he was guilty of nothing; that when the killing was proved to have been done with a deadly weapon, or admitted by the prisoner, the burden of showing the mitigating circumstances shifted to the prisoner, and this he must show, not by a preponderance of testimony, or beyond a reasonable doubt, but to their satisfaction, and if the jury were left in doubt as to the mitigating circumstances, it would be a case of murder; that in weighing the testimony of the witnesses, the jury could consider their bias or interest in the matter, if they had any, in determining their credit, and where the prisoner and his relations went upon the stand the law directed the jury to scrutinize their testimony carefully, because of their interest in the result; that, however, notwithstanding such interest, the jury might believe all they said—or part of it—or none of it—according to the conviction produced upon their minds, of its truthfulness.

Such is a narrative, in abbreviated form, of the facts testified to at the trial, and the directions given by the Court to the jury upon the different aspects in which the evidence may be considered by the jury in arriving at a verdict.

Upon the testimony of the State, the case was one of unprovoked murder, with few or no palliating incidents, and

but little impaired in its force by the prisoner's own version of the occurrence, taken in connection with what the others present at the time testified. It certainly was as favorable as the prisoner could ask, to tell the jury if his statement was accepted the homicide was committed in self-defence, and that in no view was it the result of sudden provocation and passion—constituent elements in the crime of manslaughter.

And so in reference to the burden of proof of matters of mitigation, which may reduce the crime to a lower grade, the charge is in harmony with the repeated rulings in this Court. *State* v. *Haywood,* Phil., 376; *State* v. *Johnson,* 3 Jones, 266; *State* v. *Ellick,* 2 Winst., 56; *State* v. *Willis,* 63 N. C., 26; *State* v. *Smith,* 77 N. C., 488; *State* v. *Bowman,* 80 N. C., 432; and *State* v. *Brittain,* 89 N. C., 481. In the last of which cases, the opinion delivered by our late associate, Mr. Justice ASHE, contains an elaborate and exhaustive review of the rule.

The second portion of the charge, in reference to the credibility of witnesses testifying in behalf of one to whom they are nearly related, or of an associate, is sustained by the cases of *State* v. *Nash,* 8 Ired., 35; *State* v. *Nat,* 6 Jones, 114; *Flynt* v. *Bodenhamer,* 80 N. C., 205; *State* v. *Hardee,* 83 N. C., 619; *Ferrall* v. *Broadway,* 95 N. C., 551.

While a jury may be thus cautioned, the omission to give the caution is not assignable as error in law. *Wiseman* v. *Cornish,* 8 Jones' Law, 218.

We find no error in the rulings of the Court, and the judgment is affirmed.

No error.                                    Affirmed.