## STATE v. SHEPROSE HOLLAND.

(Filed 13 December, 1939.)

**1. Criminal Law §§ 52b, 78d—**

A defendant waives his exception to the overruling of his motion to dismiss as of nonsuit by failing to renew his motion at the conclusion of all the evidence.

**2. Homicide § 25—Evidence held sufficient for jury on question of defendant's guilt of murder in the first degree.**

Evidence tending to show that defendant, his wife and his step-son were living together, that defendant took out a policy of insurance on his step-son, that thereafter he told his step-son that he would not live as long as he had lived, that on the afternoon of the same day he, his wife and step-son were at the mill where he was employed, that he sent his wife away on an errand, that a short while thereafter defendant went to a nearby store and informed those there that his step-son had drowned, that the body of the child was found floating on the water, that there was no water in the lungs and no indications of drowning, but that the body showed signs that the child had been strangled to death, together with evidence of other incriminating circumstances *is held* sufficient to be submitted to the jury and sustain their verdict of guilty of murder in the first degree.

**3. Criminal Law § 38a: Homicide § 23—**

The trial court has discretionary power to admit in evidence drawings and photographs of the scene of the crime for the purpose of illustrating the testimony of the witnesses, and its action in admitting properly identified drawings and photographs for this purpose and excluding them as substantive evidence is not error.

**4. Same: Criminal Law § 78c—**

Deceased was found dead floating on a millpond. A witness was permitted to testify as to experiments made with boards thrown into the pond while the mill was in operation to determine the drift or flow of the stream. *Held:* The admissibility of the evidence of the experiment was for the determination of the court in its discretion, and upon subsequent evidence that the mill was not in operation at the time the body of deceased was found in the pond, defendant should move to strike and his failure to do so waives his exception.

**5. Criminal Law § 31a—**

The person embalming the body of the deceased testified that pressure had been applied on the neck below the Adam's apple requiring incisions in the neck before the tongue could be placed in proper position. The court expressly excluded the testimony by the witness as to what produced the pressure. *Held:* Defendant's objection to the admission of the testimony is untenable.

**6. Criminal Law § 41f—Charge as to consideration jury should give testimony of defendant held without error.**

An instruction to the effect that the law looks with suspicion on the testimony of the defendant in his own behalf, that the jury should scrutinize such testimony and take it with a degree of allowance, but that the rule which regards it with suspicion does not reject it, and that if the jury under all the facts and circumstances believes the witness has sworn to the truth that they should give his testimony as full credibility as that of any other witness, *is held* without error.

**7. Homicide § 27a—**

The failure of the court to define "feloniously" and "willfully" will not be held for error when its definition and explanation of the law of murder includes the meaning of these terms, certainly in the absence of a request for instructions by defendant.

APPEAL by defendant from *Williams, J.,* at July Term, 1939, of DUPLIN. No error.

Criminal prosecution tried upon indictment charging the defendant with the murder of Ray Goodman, his step-son about three years of age.

The State offered evidence tending to show:

The defendant entered into the employment of one Sutton about the first of the year, 1939, as operator of a corn mill. In March, 1939, he married one Sallie Goodman and began to live in a small house situated near the millpond. At the time of the marriage, Ray Goodman, the three-year-old son of Sallie Goodman, was living with another couple

but was taken into the home of the defendant about thirty days after the marriage. On about 28 April, defendant procured a funeral benefit policy providing for the payment of burial expenses in the case of the death of the boy; and one providing for the payment of such expenses in the case of the death of his wife. On 22 May, the defendant procured a life insurance policy on the life of Ray Goodman, in which the defendant was named as beneficiary. This policy provided for the payment of $600 in the event of the death of the insured within one year; $800 in the event of the death after one year but within two years; and for the payment of $1,000 in the event of death at any time after two years. Application for this policy was dated 1 May, 1939, and the first premium thereon was paid by the defendant. On the morning of 7 June the defendant was heard to say to the deceased, "You are not going to live as long as you have lived." On the afternoon of 7 June, 1939, the defendant, his wife and Ray Goodman were at the old mill where the defendant was working. His employer and others were at a filling station and store some distance away. The defendant sent his wife to the house to get a bucket and some lard to fry some fish. A few minutes thereafter the defendant went to the filling station and told Marcellus Sutton that Ray Goodman was in the millpond and asked him to go and get him out. Sutton went and found the deceased in the mill race floating on top of the water, lying on his back with all of his face on top of the water, his arms spread out, his mouth open, and his tongue a little out of his mouth and his eyes pushed or swelled out of his head. The body was so near to the sills or "sheets" that Sutton was able to rescue the body without getting in the water himself. After the body was rescued it was discovered that the bib to his overalls, the front part of his shirt, his face and the front part of his hair were dry and showed no appearance of having been in the water. When first seen in the water the overalls and shirt of the deceased looked as if they had air in them. When taken out of the water the deceased showed no signs of life.

When the defendant was asked whether he had funeral benefit insurance for the child he stated that he did. When asked about life insurance he denied that the life of the child was insured. There was likewise evidence that the defendant could swim but that he stated that the reason he did not take the child out of the water was because he could not swim.

When the body was taken to the funeral home the undertaker discovered that there were bruises on either side of the forehead and on either side of the neck, on the left side a good size bruise and on the right a smaller bruise just over the clavicle just below the Adam's apple, and one on the shoulder. There were three bruises under the left shoulder,

two small ones and one about the size of a silver dollar and bruises on both legs. The funeral director was unable to discover any water in the lungs. The tongue of the deceased was protruding and the undertaker had to make two slits in his neck in order to get the tongue back in his mouth.

The body was exhumed on the 9th and a *post-mortem* was had. The physicians could discover no water in the lungs. They did discover a discoloration on each side of the forehead over each eye, bruised spots on each side, midway and over the clavicle or collar bone, small bruised spots on the neck showing pressure on the external tissue and hemorrhage of the small blood vessels of the skin, showing a bruised condition same as choking just below the thyroid or Adam's apple low down just above the collar bone; small bruised spots back of the neck and on the back below the left shoulder blade, a few bruised spots—dark blue in coloration—further down on the back. The eyes were protruding, there was swelling around the eyeballs and the pupils were dilated. There was no fracture of the skull or other bones. The tongue was partially protruding, forming pressure against the teeth. There was no water in the ears, chest, abdominal cavity, throat or bronchial tubes. There was no swelling of the lungs or bronchial tubes and there was no water in either.

In the opinion of each of the physicians death was caused by strangulation by external means by force at the hands of some other person.

It was further shown that the body of a person who drowns will ordinarily sink and the body of a person put in water after death will float. It likewise appears that the defendant, on the next day, was under the influence of liquor and did not attend the funeral.

There was a verdict of guilty of murder in the first degree as charged in the bill of indictment. Judgment of death by asphyxiation was pronounced. The defendant excepted and appealed.

*Attorney-General McMullan and Assistant Attorneys-General Bruton and Patton for the State.*

*George R. Ward and Gavin & Gavin for defendant, appellant.*

BARNHILL, J. When the State rested the defendant moved to dismiss as of nonsuit. The motion was overruled and the defendant excepted. The record discloses that this motion was not renewed at the conclusion of all the evidence and is, therefore, abandoned.

Counsel for the defendant insist that it is their recollection that such motion was renewed. Assuming this to be the fact, it will avail the defendant nothing. The evidence offered was amply sufficient to justify the submission of the cause to a jury.

Assignments of errors Nos. 1, 2, 4 and 7 all relate to the introduction and use in evidence of drawings and photographs of the Sutton Mill site. These exceptions cannot be sustained. The record discloses that the drawings and each of the photographs were properly identified as true representations of the location. In admitting them in evidence the court expressly limited their use for the purpose of illustrating testimony of the witnesses. It excluded them as substantive testimony.

The diagram and photographs were competent for the purposes for which they were admitted. *S. v. Spencer,* 176 N. C., 709, 97 S. E., 155; *S. v. Lutterloh,* 188 N. C., 412, 124 S. E., 752. "Such exhibits are generally used to illustrate the *locus in quo* of a crime, and the admission, not as testimony but as illustrative of testimony, rests in the discretion of the trial court." Wharton's Criminal Evidence, 11 Ed., Vol. 2, p. 1316.

Assignment of error No. 5 is directed to the alleged error of the court in permitting the witness Pierce to testify as to an experiment he made with the use of two boards thrown in the pond while the water mill was in operation, to determine the drift or flow of the stream. It did not then appear, and did not appear until the defendant testified, that the mill was not in operation at the time the body of the deceased was found in the pond. When it did so appear there was no motion to strike. Such experiments and evidence as to the result thereof are relevant. 22 C. J., 755; *Cox v. R. R.,* 126 N. C., 103; *S. v. Graham,* 74 N. C., 646. "Whether or not evidence of experiments is admissible is, under the circumstances of each case, a preliminary question for the determination of the court in the exercise of its discretion, which will not be interfered with by an appellate tribunal unless an abuse is made clearly to appear. *Blue v. R. R.,* 117 N. C., 644; *Cox v. R. R.,* 126 N. C., 103." *S. v. McLamb,* 203 N. C., 442, 166 S. E., 507. If the evidence became irrelevant upon the later showing through the defendant that the mill was not in operation on the date of the alleged homicide, defendant's failure to move to strike was, in effect, a waiver of the exception.

Exceptions to the admission of the evidence of the burial director and the embalmer over objection of defendant cannot be sustained. This witness testified to the fact of pressure below the Adam's apple which required incisions in the neck before the tongue could be placed in the proper position. The court expressly excluded any testimony on the part of this witness as to what produced the pressure.

The defendant assigns as error the following excerpt from the charge of the court, to wit: "Now, with respect to the evidence, I charge you that the law looks with suspicion upon the testimony of interested parties, or those testifying in their own behalf, and that you should carefully and cautiously scrutinize the evidence of interested witnesses, if you

find them to be interested. It is the province of the jury to consider and decide the weight to be given to such testimony, taking into consideration the conduct and deportment of the witness on the stand, his mental capacity and opportunity to know the facts and the circumstances in relation to the transaction, and the relationship in which the witness stands to the party charged. Such evidence should be taken with a degree of allowance, and not be given the same weight as that of a disinterested witness, but the rule which regards it with suspicion does not reject it, or necessarily impeach it, and if from their testimony, or from it and other facts and circumstances in the case, the jury believes such witnesses have sworn to the truth then they are entitled to as full credibility as any other witness, and you should give their testimony as much weight as you would the testimony of a disinterested witness."

Since the adoption of the statute permitting a defendant to testify in his own behalf it has been held that it is not improper, when the defendant has testified in his own behalf, for the presiding judge, in his charge, to instruct the jury that his testimony should be taken "with a grain of allowance"; *S. v. Green,* 187 N. C., 466, 122 S. E., 178; *S. v. Nat,* 51 N. C., 114; that his testimony should be received with caution and scrutinized with care; *S. v. Williams,* 185 N. C., 643, 116 S. E., 517; *S. v. Barnhill,* 186 N. C., 446, 119 S. E., 894; *S. v. Byers,* 100 N. C., 512, *supra; S. v. Lance,* 166 N. C., 411, 81 S. E., 1092; "is regarded with suspicion"; *S. v. Lee,* 121 N. C., 544; *S. v. Boon,* 82 N. C., 638; *S. v. Holloway,* 117 N. C., 730. When this is done the court should further instruct the jury, in substance, that after so weighing and considering the testimony of the defendant the jury should give his testimony such weight as it considers it is entitled to, and if the jury believes the witness it should give his testimony the same weight it would give the testimony of any other credible witness. *S. v. Holloway, supra; S. v. Collins,* 118 N. C., 1203; *S. v. McDowell,* 129 N. C., 523; *S. v. Lee, supra; S. v. Barnhill, supra; S. v. Williams, supra; S. v. Green, supra.*

There is no hard and fast form of expression or consecrated formula required but the jury may be instructed that as to the defendant the jury should scrutinize his testimony in the light of his interest in the outcome of the prosecution but that if after such scrutiny the jury believes that the witness has told the truth, it should give his testimony the same weight it would give the testimony of any other credible witness. *S. v. Green, supra.*

Counsel for the defendant concedes that the rule as stated in the foregoing excerpt from the charge has been approved by this Court with the exception of the use of the word "suspicion" in the latter portion thereof. Having instructed the jury "that the law looks with suspicion upon the testimony of interested parties, or those testifying in their own behalf,"

it was the duty of the court to qualify this statement, as it did, by stating "but the rule which regards it with suspicion does not reject it, or necessarily impeach it, and if from their testimony, or from it and other facts and circumstances in the case, the jury believes such witnesses have sworn to the truth then they are entitled to as full credibility as any other witness, and you should give their testimony as much weight as you would a disinterested witness." We cannot conceive that this was harmful to the defendant under the existing rule. It would have been error to have omitted this qualification.

 The exceptions of the defendant directed to the failure of the court to define "feloniously" and "willfully" cannot be sustained. An intentional killing is a willful killing. One who in furtherance of a fixed design kills another in cold blood is guilty of a felonious killing. In fact, any intentional killing without just cause, excuse or justification is felonious. The court fully charged the jury upon the law of murder. The definitions and explanations in respect thereto included the meaning of a willful and felonious killing. We cannot conceive that it would have been helpful to the defendant for the court to proceed further to give definitions of these two words. Certainly it was not error for it to fail to do so in the absence of special prayer by the defendant.

We have carefully examined the other assignments of error contained in the record and brought forward and debated in the brief of the defendant. None of them can be sustained.

The defendant has been accorded a fair trial under a charge which is full and complete. While the defendant offered evidence which tends to contradict the testimony of the State's witnesses, it was for the jury to determine the facts. It has done so adversely to the defendant. We can find no cause for disturbing the verdict or the judgment.

No error.