STATE OF NORTH CAROLINA v. THOMAS LEE KING AND JOSEPH KING

No. 8

(Filed 26 June 1975)

1. Criminal Law § 92— father and son charged with same crime — consolidation proper

In a prosecution for robbery with a dangerous weapon and first degree murder, the trial court did not err in consolidating for trial cases against defendants who were father and son where the offenses charged were of the same class, related to the same crimes, and were so connected in time and place that most of the evidence at trial on one of the indictments would be competent and admissible at the trial on the others, each defendant relied on an alibi as a defense, and defendants' defenses were not antagonistic.

2. Constitutional Law §§ 32, 33; Criminal Law § 55— blood and hair samples — presence of counsel at taking — admissibility

In a prosecution for robbery with a dangerous weapon and first degree murder, the trial court did not err in allowing the State to introduce evidence against defendants regarding extraction of blood and hair samples from them and comparisons made between defend-

ants' blood and that of the victims where there was evidence that the victims sustained blows to the head and stabbings, one victim hit one of the defendants in the head with a hammer, bloodstained clothing was seized from one defendant's house, and a witness testified that he transported one defendant in his cab on the night of the crime and that defendant had bloodstains on his clothing; furthermore, defendants cannot complain of absence of their counsel when the blood samples were taken since counsel were specifically allowed, if they so desired, to be present but were not, and the court offered to have the blood withdrawing procedure disregarded and another one staged in counsel's presence, but counsel made no request therefor.

3. **Criminal Law §§ 51, 99— expert witnesses — finding of expertise — no expression of opinion by court**

Evidence with respect to qualifications of witnesses in the fields of blood typing, fingerprint identification and comparison, forensic serology and pathology fully supported the trial court's findings that the witnesses were experts and the trial court's rulings to that effect made in the presence of the jury did not amount to an expression of opinion regarding the credibility of the witnesses.

4. **Criminal Law § 114— jury instruction as to expert witness — no expression of opinion**

Trial court's statement to the jury that "an experienced fingerprint analyst of the N. C. Bureau of Investigation and his supervisor" testified in behalf of the State was made in recapitulating the State's evidence and was amply supported by the testimony concerning the training and experience of the witnesses.

5. **Criminal Law § 42— robbery with dangerous weapon — hammer near crime scene — admissibility**

In a prosecution for robbery with a dangerous weapon and first degree murder, the trial court did not err in allowing into evidence a hammer found by officers on the day after the crime 385 feet from the scene of the crime lying under a dump truck where the surviving victim testified that the hammer introduced in evidence was similar to the one with which her assailant hit her, and blood found on the hammer was of the same group as that of the victim.

6. **Criminal Law § 95— statement of defendant implicating codefendant — restrictive instruction proper**

The introduction of an out-of-court statement of one codefendant directly implicating the other entitles the other, upon even a general objection, to a restrictive instruction, and if the codefendant who made the statement implicating the other does not testify and is thus not available for cross-examination, a restrictive instruction is not sufficiently palliative and the complaining defendant is entitled to a new trial.

7. **Criminal Law § 95— no statement implicating codefendant — no restrictive instruction required**

Defendants were not entitled, upon their general objections, to restrictive instructions from the trial judge, since no statement of either codefendant implicating the other was admitted in evidence.

State v. King

8. Criminal Law § 113— jury instructions — failure to define "attempted"
   — recapitulation of defendants' evidence

   In a prosecution for armed robbery with a dangerous weapon and
   first degree murder, the trial court did not err in failing to define
   the word "attempted," nor did the court err in his jury instruction
   by failing to state all of the evidence favorable to the defendants.

   Chief Justice SHARP and Justices COPELAND and EXUM dissenting
   as to death penalty.

APPEAL by defendants pursuant to G.S. 7A-27(a) from
*Hasty, J.*, at the 15 July 1974 Session of GASTON Superior Court.

On indictments proper in form, defendants were convicted
of robbery with a dangerous weapon and first degree murder.
The trial judge ruled that the act of robbery with a dangerous
weapon was an essential element of the State's proof of murder
in the first degree and that the robbery charges merged into the
murder charges. Judgments imposing the death penalty as to
each defendant were entered on the first degree murder con-
victions.

The trial of these cases began on 15 July 1974 and ended
on 31 July 1974. The record of the trial, in two volumes, con-
sists of 621 pages. For this reason our summary of the evidence,
in order to be fair to both the State and defendants, of necessity
is given in some detail.

The State's evidence is summarized as follows: On Satur-
day night, 16 February 1974, Mr. Leo Davis, age 72, and his wife
Missouri Davis, age 65, were living in their five-room brick
home at 402 North Pine Street in Gastonia where they had lived
for thirty-three years. They retired for the evening about 9:00
p.m. At approximately 11:00 or 11:30 p.m., the doorbell rang
and Mr. Davis went to the door and opened it. Mrs. Davis fol-
lowed her husband to the door because she knew he did not see
well. The two defendants entered through the opened door and
Thomas King told Mr. Davis, who bought and sold guns, that
he wanted to see one of his rifles. Joseph King, father of Thomas
King, took a seat in the den on a couch about two or three feet
from where Mrs. Davis was sitting in a chair. Thomas looked
at the rifle and then gave it back to Mr. Davis. As Mr. Davis
turned to replace the rifle on the rack, Thomas "reached in his
pocket and got something and hit [Mr. Davis] in the head with
it." Mrs. Davis then hit Thomas in the back with her fist, saying,
"Don't you hit him like that." At that point, Joseph hit Mrs.

Davis from behind with a hammer and "skint the top of [her] head off." Mrs. Davis observed Thomas place his hands around her husband's neck as Joseph dragged her into the bedroom, pushed her onto the floor, hit her with the hammer, and stabbed her five times in the chest. When Joseph dropped the hammer, she picked it up and hit him several times with it. Soon thereafter, Thomas entered and demanded money, and Mrs. Davis opened the safe in the bedroom for them. Finding no money there, defendants again demanded money, whereupon she gave them $180 from her pocketbook. Defendants then tied Mrs. Davis with a sheet, cut the cord to the telephone, and left. When Mrs. Davis untied herself, she saw her husband's lifeless body lying in the den. She then went to a neighbor's and called the police. She was taken by ambulance to Gaston Memorial Hospital and soon after to Charlotte Memorial Hospital where she remained for approximately two weeks.

Mrs. Davis further testified that a metal box containing over $300 in half-dollars and quarters was missing from her safe after the robbery. She did not see anyone remove the box from the safe but she had seen it there when she opened the safe. Thomas was wearing a white shirt with light blue pants and Joseph was wearing dark clothes and a yarn cap on the night in question. The face of neither was covered in any way. Mrs. Davis noticed a scar or laceration on Thomas's lip. When the two men entered her home on the night of 16 February 1974, she was of the opinion, judging from the tone of the conversation, that her husband knew these men. She later remembered Joseph from his having lived in that neighborhood ten to twelve years earlier, although she had not known Thomas during that period.

Mrs. Davis selected the pictures of both defendants from photographic lineups as being the men who had committed these crimes.

Donald Robinson, a driver employed by Yellow Cab Company, received a call about 1:00 a.m. on 17 February 1974 to go to Circle View Drive in Gastonia. There he picked up the two defendants. Thomas entered the front seat and Joseph entered the back seat. Thomas was wearing light blue pants and a dark blue "dress-type" coat. The pants had a heavy stain on the right leg. Joseph's face and head were scratched and bloody. They told Robinson "something about being in a poker game and [getting] in a fight." Thomas referred to Joseph as "some-

thing like 'Pappy'." Robinson let them out at Houser's Superette on the corner of Wilkinson Boulevard and West Club Circle about three miles from where he picked them up. Thomas paid the $1.70 fare in coins, "mostly quarters."

Mrs. Brenda Lowrance testified that between 12:40 and 12:50 a.m. on 17 February 1974, defendant Thomas King came to her door on Circle View Drive in Gastonia and asked to use a telephone to call a cab. Thereupon, Mrs. Lowrance called a cab for him. Mrs. Lowrance lives about three-fourths of a mile from the Davis residence.

Charles Heffner of the Gastonia Police Department testified that while investigating this case in the early afternoon of 17 February, he found a hammer under a large truck 385 feet from the Davis residence. The residence itself was in general disarray, and there were brownish red stains throughout.

Marvin Barlow of the Gastonia Police Department testified that a small metal box was found at the Davis residence immediately outside the bedroom door. From this box three latent fingerprints were lifted and these were later identified by expert witnesses as belonging to Thomas King.

At about 7:30 a.m. on 19 February 1974, Gastonia police officers arrested Joseph King at his home at 130 West Club Circle Drive. During a lawful search of the premises, officers discovered on the living room couch a dirty blue jacket that had stains on the left shoulder.

Miss Laura Ward, a forensic serologist with the State Bureau of Investigation, testified that tests made on the coat found at Joseph King's residence on 19 February 1974 revealed the presence of human blood stains. Some of these stains were group "O" and some were group "A." An examination of the hammer in evidence revealed human blood stains of group "O." Miss Ward tested Joseph's blood and found it to be group "A." Mrs. Davis's blood was found to be group "O."

There was medical testimony to the effect that Leo Davis died as a result of asphyxiation due to manual strangulation.

Defendants' evidence is summarized as follows: When Joseph King was arrested on the morning of 19 February, it appeared to officers he had not shaved for several days. Joseph was cooperative with officers, and explained to them that scratches and a bruise on his head were caused when he hit

his head on a rusty nail in the basement of his house. He further told officers that although he knew Mr. Davis he had not seen him since he moved ten years ago from the neighborhood where the Davises lived. Joseph King did not testify at trial.

Defendant Thomas King testified that he was 23 years old and that he knew Mr. and Mrs. Davis because as a teenager he did yard work for them over a period of about two years. At about 2:30 or 3:00 p.m. on 16 February 1974, he went to Charlotte with a friend named Ronald Bridges to shoot pool at a place called Smitty's. He was wearing a dark blue jacket and burgundy pants and at no time that night was he wearing blue pants. He left Smitty's about 8:00 or 8:30 p.m. and returned home to Gastonia. He went to the home of his in-laws because he was unable to get heating oil for his house. There, he had a late supper and made arrangements to have his wife and children stay there for the night. He called his parents' home to arrange to sleep there for the night because there was not enough room for him at the home of his in-laws. When he called there, his father Joseph King was intoxicated. He then left to go a couple of blocks to a package store to get a six-pack of beer. He planned to catch a ride from there to his parents' house. While thumbing a ride to the package store, he caught a ride with a man who said he was going to Charlotte to shoot pool. Thomas decided to go to Charlotte with this man, and was let out at the Little Rock Cue Lounge in Charlotte between 10:00 and 10:30 p.m. There he saw a waitress named Debbie, Jeff Anderson, Lindsey Caldwell, and a girl whose nickname was "Sam." Of these, only "Sam" testified at trial. He shot pool at the Little Rock Cue Lounge until 12:00 or 12:15 a.m. At that point, he caught a ride with a man named Bill Patrick whom he had never seen before. Bill Patrick did not testify at trial.

Upon entering Gastonia, Bill Patrick's 1969 Chevelle had a flat tire. This occurred about 12:45 or 1:00 a.m. Patrick did not have a spare tire so he and Thomas walked to the Lowrance residence nearby, knocked on the door, and asked the lady who answered the door to call a cab for them. Thomas told Patrick to come with him to his father's house and they would make arrangements for Patrick's car. Thomas told the cab driver to stop at Houser's Superette because he wanted to make a purchase. There, he and Bill Patrick left the cab and he paid the driver $1.70 with quarters he had gotten at the pool hall. There was no blood on the clothing of either defendant or Bill Patrick.

Bill Patrick went to a pay phone booth and defendant went inside the superette and purchased a fifth of wine. After buying the wine, defendant and Bill Patrick parted and defendant walked the short distance to his parents' house. He entered the house about 1:10 or 1:20 a.m. and observed his father "passed out" on the couch in the living room. Thomas continued to the bedroom, got into bed, and began to read. His father awoke and entered the bedroom, and he and Thomas began struggling for the wine. Joseph, who was intoxicated, hit Thomas in the nose and Thomas retaliated with blows to the face which caused Joseph to hit his head on the door facing. Thomas then gave his father the bottle of wine and his father returned to the couch.

Thomas further testified that he was employed in the business of selling baby pictures and had been so employed for more than four years. His income for 1973 was between $10,000 and $11,000. He denied going to the Davis residence on 16 February 1974 and denied that he ever had a scar or any sort of laceration on his lip. He further denied that he changed clothes on 16 February 1974 or that he had blood on his trousers at any time during that period. Thomas stated that he has never referred to his father as "Pappy" or "Pop" in his life. He also denied that the fingerprints found on the metal box were his.

Ronald Lee Bridges testified that on the afternoon of 16 February 1974 he and Thomas shot pool together at Smitty's in Charlotte until about 8:00 or 8:15 p.m. Defendant had on deep red pants at that time.

David Timothy Messick testified that Thomas King's general reputation is good. He and Thomas cleaned up the Davis yard together on one occasion when they were younger. On cross-examination, Messick testified that the two boys were twelve or thirteen years of age when they did this.

Jimmy Johnson testified that he saw Thomas King and another boy cut the Davis yard on several occasions when Thomas was about sixteen years of age.

Eight witnesses, including Thomas's employer, testified that Thomas's character and general reputation were good.

Alvin Leon Carr testified that about 10:45 p.m. "on a Saturday about five or six months ago" he saw Thomas at the Little Rock Cue Lounge. Carr did not remember the date or anything

about what Thomas was wearing at the time. He did not see a woman named "Sam" shooting pool.

Samantha Elizabeth McAnulty (Sam) testified that she saw Thomas at the Little Rock Cue Lounge on 16 February 1974. She remembered what she was doing on 16 February because that is her birthday. Thomas was still there at 12:30 a.m. On cross-examination, she testified that she could not swear that she had ever seen Thomas before that date, that she does not remember with whom he was playing, and that she does not know anyone named Bill Patrick.

Mrs. Ollie Lewis testified that she is the mother-in-law of Thomas King and that he was wearing burgundy pants and a dark blue coat on the night of 16 February 1974 and during the next day. He left her house about 9:30 p.m. on 16 February and did not say where he was going.

Mrs. Thelma Seay King testified that she is the mother of Thomas King and wife of Joseph King. Joseph had been drinking since Thursday and was intoxicated when Mrs. King went to work Saturday morning, 16 February 1974. Joseph was wearing dark blue trousers and a dark blue shirt. When Mrs. King returned from shopping between 6:00 and 7:00 p.m., Joseph was home alone and was still intoxicated. She read between 7:00 and 10:30 p.m. and then went to bed. Sometime that night she heard noises from inside the building as if someone had fallen, but she did not get up. When she awoke the next morning about 6:30 or 7:00 a.m., she saw her husband on the couch wearing the same clothes and in the same condition as the night before. There were two or three wine bottles around him. The end table near the couch was out of place but she did not notice anything else. She saw her son in bed in the bedroom, and he explained that he had stayed there for the night because he had no oil at his house and because of his father's condition he did not want to bring his wife and children there. If Thomas was drinking when Mrs. King saw him, she could not tell it. Thomas was wearing burgundy pants, a T-shirt, and jacket, and she noticed no stains on his clothing. Thomas told his mother that he and his father had had a scuffle the night before. In her opinion, when she went to bed about 10:00 or 10:30 the night before, her husband was not able to go anywhere by himself.

Mrs. King further testified that a light blue pair of pants was in her clothes hamper on 17 February 1974 when she put

other clothes there but she did not know how long the pants had been there. She noticed that the blue pants had a stain somewhere on the front. She stated that her son Timothy owns these blue pants and that, in her opinion, Thomas could not wear them. She also testified that these pants had been in the hamper since sometime in January 1974.

Timothy Eugene King, brother of Thomas and son of Joseph, testified that he owned the jacket found on the couch and the pair of light blue pants found in the hamper. His blood type is "O," and the stains on both articles of clothing were there when he last saw them in January 1974. The stains were the result of work-related injuries that caused him to bleed and of a blow which he received in the mouth during a fight at which he was a bystander. He further testified that the pants fit him but are too small for his brother Thomas.

On rebuttal the State offered testimony that police officers discovered the blue pants in evidence during the search of the Joseph King residence on 19 February 1974 in a laundry hamper in the bathroom. Analysis of a stain on the right leg of these pants revealed the presence of blood, group "O." Thomas King's blood was found to be group "A."

*Attorney General Rufus L. Edmisten, Assistant Attorney General Thomas B. Wood and Associate Attorney Archie W. Anders for the State.*

*Frank Patton Cooke for Thomas Lee King, defendant appellant.*

*Robert H. Forbes for Joseph King, defendant appellant.*

MOORE, Justice.

[1]   Joseph King moved for a separate trial and assigns as error the denial of his motion. These defendants were charged in separate bills of indictment with identical crimes. The offenses charged are of the same class, relate to the same crimes and are so connected in time and place that most of the evidence at the trial on one of the indictments would be competent and admissible at the trial on the others. Each defendant relied on an alibi as a defense and their defenses were not antagonistic. Under such circumstances, the trial judge was authorized by G.S. 15-152 (repealed by Sess. Laws 1973, c. 1286, s. 26, effective July 1, 1975) in his discretion to order their consolidation for

trial. *State v. Bass,* 280 N.C. 435, 186 S.E. 2d 384 (1972) ; *State v. Turner,* 268 N.C. 225, 150 S.E. 2d 406 (1966) ; *State v. Hamilton,* 264 N.C. 277, 141 S.E. 2d 506 (1965) ; *State v. Morrow,* 262 N.C. 592, 138 S.E. 2d 245 (1964).

No statement made by either defendant was admitted which tended to incriminate or prejudice the other defendant. Hence, the rule as set out in *Bruton v. United States,* 391 U.S. 123, 20 L.Ed. 2d 476, 88 S.Ct. 1620 (1968), as applied in *State v. Fox,* 274 N.C. 277, 163 S.E. 2d 492 (1968), does not apply.

Defendant further contends, however, that the action of Judge Hasty in consolidating the cases for trial was void because it overruled a prior order entered by Judge Grist, and that one superior court judge cannot overrule an order entered by another superior court judge. It should first be noted that the order of Judge Grist to which defendant refers was entered at a hearing held for the purpose of setting bond. This hearing was held on 13 June 1974 and after hearing a number of witnesses, Judge Grist entered an order denying the motion for allowance of bond for each defendant. He then added that the cases were held for further consideration, and

"That the State has indicated that [it] will *probably* not proceed in both cases at the same term and counsel for the defendant, Joe King, Mr. Robert H. Forbes, has indicated he would *likewise move* that the matters not be consolidated for trial.

"It further appearing to the Court that the cases were calendared for trial during the week of June 10, 1974, and that the defendants were ready for trial and that it became necessary that the State move for a continuance because of the absence of private prosecution, Mr. Grady B. Stott, and the Court having considered the motion for a bond as a further motion for a speedy trial;

"THE COURT ORDERS that the State be required to elect as to which case it desires to try and that said case be placed on the calendar for trial in Gaston County on July 15, 1974." (Emphasis added.)

At the hearing before Judge Grist on 13 June 1974, no motion for a severance was pending. Such motion was not made until 9 July 1974. Judge Grist never considered this motion, and his order of 13 June only referred to future probabilities. There-

fore, Judge Hasty did not overrule Judge Grist. This contention is without merit.

The cases were properly consolidated for trial and the foregoing assignment of error is overruled.

[2]   Defendants next contend that the trial court erred in allowing the State to introduce evidence against defendants regarding extraction of blood and hair samples from them and the comparison of blood from defendants and Missouri Davis with exhibits introduced into evidence by the State. Defendants contend that there was no factual basis for allowing these blood samples to be drawn and hair samples taken. There is no merit in this contention.

When the State moved to require defendants to submit to the extraction of blood samples and to furnish hair samples, Judge Snepp, after hearing evidence and arguments of counsel, made findings of fact fully supported by the evidence as follows:

"(1) On 16 February 1974, the dead body of Leo Davis was found by police at his home in Gaston County. It was also discovered that his wife had sustained multiple head wounds.

"(2) Mrs. Davis advised the investigating officers that two subjects assaulted her and her husband in their home; that one wore a head covering of some type; that one used a hammer as a weapon; that in a struggle with one of the persons she hit him with the hammer.

"(3) Investigating officers found a toboggan-style cap in the Davis home with hair inside it. Mrs. Davis has advised investigating officers that the cap was not her property or her husband's.

"(4) Investigating officers found a claw-type hammer lying under a truck one-half block from the Davis home. There appeared to be dried blood on the hammer.

"(5) Mrs. Davis, who is still in the hospital as a result of her injuries, has made a photographic identification of the defendants as the persons who assaulted her and her husband.

"(6) On 19 February 1974, investigating officers under authority of a search warrant searched the home of

the defendant, Joseph King, and seized clothing which appeared to be bloodstained. Apparent bloodstains were also found on the woodwork in the home.

"(7) Donald Robinson, a cab driver for Yellow Cab Company, has informed investigating officers that early in the morning after this occurrence the defendant, Tommy King, was a passenger in his cab and that the said defendant had apparent bloodstains on his clothing.

"(8) Blood samples from Mr. and Mrs. Davis have been obtained and sent to the State Bureau of Investigation for analysis.

"(9) Samples of stains on the hammer and clothing have been sent to the State Bureau of Investigation for analysis, and the bureau has advised investigating officers that the stains are blood.

"(10) The defendant, Joseph King, has stated to investigating officers that he received some cuts at his home which resulted in the bloodstains to his clothing.

"(11) The defendants both appear to be healthy males, and there is no evidence that either suffers from any illness, disease, or physical disability which would make a reasonable withdrawal of blood deleterious to his health.

"(12) That it is reasonably necessary for the State to secure hair samples and bloodstain samples from the defendants and that they will be of material aid in determining whether the defendants committed the offenses charged."

Based on these findings, Judge Snepp properly ordered that blood and hair samples be taken.

Defendants' counsel concede that their constitutional rights were not violated by the involuntary withdrawal of blood and taking of hair samples, citing *State v. Cash,* 219 N.C. 818, 15 S.E. 2d 277 (1941), and 21 Am. Jur. 2d, Criminal Law § 364 (1965).

Defendants further contend, however, that defendants' counsel had a right to be present when the blood samples were taken, but were not. For that reason they argue that the court erred in denying their motion to suppress all evidence having to do with their furnishing blood samples and the comparison of these

samples with stains found on items of clothing and other objects at or around the scene of the crime and with the blood of the victims.

As a foundation for denying this motion, Judge Hasty found, in summary:

(1) That counsel for the defendants were specifically allowed, if they so desired, to be present when blood was extracted from their clients and a copy of said Order was served on counsel on 28 February 1974;

(2) That counsel was not present during the taking of these samples on 28 February 1974;

(3) That counsel at their request were furnished samples of the tests conducted at the hospital;

(4) That while counsel addressed complaints to their absence at the hospital during the taking of the defendants' blood, they conceded that their serious objection was to their being compelled to furnish blood and the introduction of evidence based thereon;

(5) That counsel were repeatedly told that they could have all blood tests results when received and were or would be furnished same; *and most importantly*

(6) That the court indicated, should it be the request of defense counsel, that it would order the blood withdrawing procedure disregarded, and another one staged in their presence. *No such request was made.* (Emphasis added.)

Thus, counsel for defendants, by their failure to appear when the samples were taken and to request further blood tests, effectively waived their right to complain on appeal. Even without such waiver their argument here would be unavailing, for as we said in *State v. Wright,* 274 N.C. 84, 90-91, 161 S.E. 2d 581, 587 (1968):

"The authorities hold, however, that handwriting samples, blood samples, fingerprints, clothing, hair, voice demonstrations, even the body itself, are identifying physical characteristics and outside the protection of the Fifth Amendment privilege against self-incrimination. *Schmerber v. California,* 384 U.S. 757, 16 L.ed. 2d 908, 86 S.Ct. 1826; *Gilbert v. California* [388 U.S. 263, 18 L.Ed. 2d 1178, 87

S.Ct. 1951 (1967)]; *U. S. v. Wade* [388 U.S. 218, 18 L.Ed. 2d 1149, 87 S.Ct. 1926 (1967)]; *State v. Gaskill,* 256 N.C. 652, 124 S.E. 2d 873; Annotation: Accused's Right to Counsel under the Federal Constitution, 18 L.ed. 2d 1420. Such pretrial police investigating procedures are not of such a nature as to constitute 'critical' stages at which the accused is entitled to the assistance of counsel guaranteed by the Sixth Amendment and made obligatory upon the states by the Fourteenth Amendment. *Gideon v. Wainwright,* 372 U.S. 335, 9 L.ed. 2d 799, 83 S.Ct. 792; *Escobedo v. Illinois,* 378 U.S. 478, 12 L.ed. 2d 977, 84 S.Ct. 1758; *Pointer v. Texas,* 380 U.S. 400, 13 L.ed. 2d 923, 85 S.Ct. 1065. . . . "

This assignment is overruled.

**[3, 4]** Defendants next contend that the trial judge erred in finding Bryan Stimball (in the field of blood typing), W. G. Layton, Jr. (in the field of fingerprint identification and comparison), Laura Ward (in the field of forensic serology), Dr. Eugene Rutland, Jr. (in the field of pathology), and Steve Jones (in the field of fingerprinting) to be experts in their respective fields and that, in announcing his findings in the presence of the jury, the judge expressed an opinion regarding the credibility of these witnesses contrary to G.S. 1-180.

Defendants further contend that the trial judge erred by reemphasizing these findings in his charge to the jury by stating that "an experienced fingerprint analyst of the North Carolina Bureau of Investigation and his supervisor" testified in behalf of the State. These contentions are without merit. Our cases have consistently held:

"Whether the witness has the requisite skill to qualify him as an expert is chiefly a question of fact, the determination of which is ordinarily within the exclusive province of the trial judge. . . .

"A finding by the trial judge that the witness possesses the requisite skill will not be reversed on appeal unless there is no evidence to support it. . . ." 1 Stansbury's N. C. Evidence § 133 (Brandis Rev. 1973), and cases therein cited.

The evidence with respect to the qualifications of each witness fully supports the findings and it is quite obvious that the rulings finding these witnesses to be experts in their respective fields could not have been understood by the jury as anything

other than rulings upon the qualifications of the witnesses to testify as to their opinions. ". . . It has never been the general practice in the courts of this State for the trial judge to excuse the jury from the courtroom when ruling upon the qualification of a witness to testify as an expert. . . ." *State v. Frazier,* 280 N.C. 181, 197, 185 S.E. 2d 652, 663 (1972).

The statement in the charge to which defendants now object was made by the trial judge in recapitulating the State's evidence and was amply supported by the testimony concerning the training and experience of these two witnesses. If defendant at the time deemed this statement to be inaccurate, he should have called the error to the trial judge's attention then and there in order to give him opportunity to correct it. His failure to do so waived whatever error, if any, there might have been. *State v. Henderson,* 285 N.C. 1, 203 S.E. 2d 10 (1974) ; *State v. Noell,* 284 N.C. 670, 202 S.E. 2d 750 (1974) ; *O'Berry v. Perry,* 266 N.C. 77, 145 S.E. 2d 321 (1965) ; *State v. Cornelius,* 265 N.C. 452, 144 S.E. 2d 203 (1965) ; *Steelman v. Benfield,* 228 N.C. 651, 46 S.E. 2d 829 (1948) ; *Manufacturing Co. v. R. R.,* 222 N.C. 330, 23 S.E. 2d 32 (1942). This assignment is overruled.

[5] Defendants assign as error the action of the trial court in admitting into evidence the hammer found by officers some distance from the scene of the crime and at a later time, and in permitting the testimony by witnesses with relation thereto. The hammer was found 385 feet from the den area of the Davis home lying under a dump truck at approximately 1:15 p.m. on 17 February 1974. Defendants contend that it was so remote from the commission of the crime both by distance and time that it was inadmissible.

Mrs. Davis testified that the hammer introduced into evidence was similar to the one with which Joe King hit her. Blood found on the hammer was group "O" as was the blood of Mrs. Davis.

Any object which has a relevant connection with the case is admissible in evidence and weapons may be admitted when there is evidence tending to show that they were used in the commission of the crime. 1 Stansbury's N. C. Evidence § 118 (Brandis Rev. 1973) ; *State v. Patterson,* 284 N.C. 190, 200 S.E. 2d 16 (1973) ; *State v. Muse,* 280 N.C. 31, 185 S.E. 2d 214 (1971) ; *State v. Sneeden,* 274 N.C. 498, 164 S.E. 2d 190 (1968).

The testimony of Mrs. Davis that the hammer was similar to the one used to hit her was sufficient identification for the purpose of introducing it into evidence. *State v. Bass, supra; State v. Patterson, supra; State v. Fox,* 277 N.C. 1, 175 S.E. 2d 561 (1970) ; *State v. Macklin,* 210 N.C. 496, 187 S.E. 785 (1936).

The lapse of time occurring between the crime on 16 February and the discovery of the hammer nearby on 17 February was not a significantly long period. This lapse of time and the distance from the scene of the crime to where it was found would not render the evidence incompetent but would only affect its probative force. 22A C.J.S., Criminal Law § 712 (1961) ; *State v. Brown,* 280 N.C. 588, 187 S.E. 2d 85 (1972) ; *State v. Payne,* 213 N.C. 719, 197 S.E. 573 (1938) ; *State v. Macklin, supra. See State v. Woods,* 286 N.C. 612, 213 S.E. 2d 214 (1975). This assignment is overruled.

Defendants next contend that the trial court erred in several instances in failing, upon general objection, to instruct the jury that certain evidence was to be considered against only one of the defendants and that such evidence was incompetent as to the other. Defendant Thomas King contends that it was error to fail to instruct that evidence of the officers' discovery and Mrs. Davis's identification of the coat found on the couch at Joseph King's residence could not be considered against Thomas King; that such an instruction should have been given regarding the court's findings that the search of Joseph King's residence was valid; and that such an instruction should have been given regarding evidence of the taking and analysis of the blood of Joseph King. Defendant Joseph King contends that the same instruction as to him should have been given regarding the State's evidence of blood tests of Thomas King and regarding evidence of comparison of fingerprints lifted from the small metal box with fingerprints of Thomas King. In support of their contentions, defendants cite *State v. Franklin,* 248 N.C. 695, 104 S.E. 2d 837 (1958). Defendants' reliance is misplaced.

*Franklin* involved a trial for forgery and uttering where, as here, cases of two defendants were consolidated for trial. There the State offered testimony of police officers that defendant Keith told them that defendant Jack Franklin gave him the fraudulent check and told him to get it cashed, and that Franklin wrote the check in Keith's house. We granted a new trial, holding that the statement of Keith to officers was hearsay

as to Franklin, and that the trial judge should have given, upon defendant's general objection, restrictive instructions. In the present cases, none of the evidence of the State offered against one defendant directly implicates the other in the crimes charged, and no statment made by either defendant was introduced. Hence, *Franklin* does not apply.

[6, 7] It is clear that the introduction of an out-of-court statement of one codefendant *directly implicating* the other entitles the other, upon even a *general* objection, to a restrictive instruction. *State v. Franklin, supra.* And, if the codefendant who made the statement implicating the other does not testify and is thus not available for cross-examination, a restrictive instruction is not sufficiently palliative and the complaining codefendant is entitled to a new trial. *Bruton v. United States, supra; State v. Fox,* 274 N.C. 277, 163 S.E. 2d 492 (1968). We are here presented with a different situation in which *no* statement of either codefendant implicating the other was admitted in evidence. Here, on several occasions when defendants *specifically* objected and requested restrictive instructions, the trial judge, in an abundance of caution, gave such instructions. We cannot discern how the trial judge could on other occasions, upon *general* objections, understand that he was being asked to give restrictive instructions, especially when such evidence in no way implicated the objecting defendant. This assignment is overruled.

The trial judge instructed the jury: "By law, any killing of a human being by a person committing or attempting to commit robbery with a dangerous weapon . . . is first degree murder, punishable by death."

[8] Defendants assign as error the failure of the trial judge to define the word "attempted." In *State v. Godwin,* 267 N.C. 216, 147 S.E. 2d 890 (1966), we said:

". . . It is not to be assumed that the jurors were ignorant and the words, 'annoy, molest and harass,' are in such general usage and so well understood by the average person that it would have been a waste of time to define them. Had the defendant thought their definition of sufficient importance to request it, it is quite likely that the court would have defined them but the failure to make such request waives any possible error. *S. v. Caudle,* 208 N.C. 249, 180 S.E. 91; *S. v. Holland,* 216 N.C. 610, 6 S.E. 2d 217."

And, in *State v. McNeely,* 244 N.C. 737, 94 S.E. 2d 853 (1956), we said:

> ". . . While the judge did not define in detail what is meant by 'an attempt to commit robbery,' the language used is accordant with ordinary meaning of the word attempt, and is clearly understandable. *S. v. Jones,* 227 N.C. 402, 42 S.E. 2d 465. . . ."

Under this same assignment defendants contend that the trial judge erred in his instruction to the jury regarding the evidence by failing to state all the evidence favorable to the defendants. G.S. 1-180 requires the trial judge to apply the law to the various factual situations presented by the evidence. *State v. Keziah,* 269 N.C. 681, 153 S.E. 2d 365 (1967). The judge is not required to recapitulate all the evidence. He is only required to state the evidence necessary to explain the application of the law thereto. The general rule is that objections to the charge in stating the contentions of the parties or in recapitulating the evidence must be called to the court's attention in apt time to afford opportunity for correction. *State v. Henderson, supra; State v. Noell, supra.* A party desiring further elaboration on a subordinate feature of a case must aptly tender request for further instructions. *State v. Noell, supra; State v. Guffey,* 265 N.C. 331, 144 S.E. 2d 14 (1965).

In the present cases, to make sure that the jury understood that he was not summarizing all the evidence, the trial judge stated:

> "Members of the Jury, I did not attempt to recapitulate or summarize all of the evidence in the cases. I only reviewed, as I recalled, what certain of the evidence offered by the State and the defendants tends to show. You will note I use this phrase, 'tends to show.' I did this because what, if anything, the evidence does show, is for you as the jury to determine. I only referred to such of the evidence as I deemed necessary to explain and apply the law in the cases. All of the evidence is before you and you are not to understand that I am emphasizing any part of the evidence over and against any other part of the evidence. All of the evidence is important and it is your duty to remember it all, consider it all and weigh it all in arriving at your verdicts in these cases. Therefore, if your recollection of what the evidence was differs from that of the

District Attorney or counsel for the State and counsel for the defendants or even the Court says it was, you will rely and be governed entirely and solely upon your own recollection of what the evidence was in these cases."

An examination of the charge discloses that the judge complied with the statutory requirement of G.S. 1-180. This assignment of error is overruled.

An examination of the entire record discloses that defendants received a full and fair trial, free from prejudicial error.

No error.

Chief Justice SHARP, dissenting as to the death penalty:

The murder for which defendant was convicted occurred on 16 February 1974, a date between 18 January 1973, the day of the decision in *State v. Waddell,* 282 N.C. 431, 194 S.E. 2d 19, and 8 April 1974, the day on which the General Assembly rewrote G.S. 14-21 by the enactment of Chapter 1201 of the Session Laws of 1973. For the reasons stated by Chief Justice Bobbitt in his dissenting opinion in *State v. Jarrette,* 284 N.C. 625, 666, 202 S.E. 2d 721, 747 (1974)—an opinion in which Justice Higgins and I joined—, I dissent as to the death sentence imposed upon defendant by the court below and vote to remand for the imposition of a sentence of life imprisonment. *See also* the dissenting opinion of Chief Justice Bobbitt, and my concurrence therein, in *State v. Waddell, supra,* at 453 and 476, 194 S.E. 2d at 30 and 47.

Justice COPELAND dissents as to death sentence and votes to remand for imposition of a sentence of life imprisonment for the reasons stated in his dissenting opinion in *State v. Williams,* 286 N.C. 422, 437, 212 S.E. 2d 113, 122 (1975).

Justice EXUM dissents from that portion of the majority opinion which affirms the death sentence and votes to remand this case in order that a sentence of life imprisonment can be imposed for the reasons stated in his dissenting opinion in *State v. Williams,* 286 N.C. 422, 439, 212 S.E. 2d 113, 121 (1975), other than those relating to the effect of Section 8 of Chapter 1201 of the 1973 Session Laws.