## 77513. IN THE INTEREST OF A. M. Y.
### (377 SE2d 893)

McMURRAY, Presiding Judge.

Petitioner filed a petition to adopt A. M. Y., a minor child, and alleged that the child's biological mother "voluntarily and in writing" placed A. M. Y. with petitioner two days after the child's birth; that petitioner "has had full custody of the minor child at all times leading up to [the] petition [for adoption]"; and that "the parents of the child . . . have failed, for a period of one year and longer immediately prior to the filing of [the] petition for adoption, to communicate or make a bona fide attempt to communicate with the child and to provide for the care and support of the child as required by law or judicial decree, and that it is in the best interest of [A. M. Y.] that the adoption take place." The biological mother responded, denied the material allegations of the petition and sought custody of A. M. Y.

The evidence adduced at a hearing showed that petitioner is 35 years of age, is unmarried and resides in Albany, Georgia. Petitioner is employed as "a secretary and administrative assistant" and has a daughter who is 14 years of age. Petitioner first obtained custody of A. M. Y. on July 2, 1986, two days after the child's birth, "when the biological mother . . . voluntarily and in writing surrendered the child to Petitioner." Other than the assumption by petitioner of the financial obligation of providing medical care, food and clothing to A. M. Y., there was no financial inducement or consideration flowing from petitioner to the biological mother for surrender of the child. From the time of the surrender, the petitioner has had full custody of A. M. Y. and "has loved her, cared for her, fed her, clothed her, nursed her, taught her and performed generally all of the functions of a natural parent." The biological mother has had no contact with A. M. Y. since delivery of the child to petitioner.

The biological mother is 27 years of age, is unmarried and resides in Albany, Georgia. She is employed as the "Senior Desk Clerk at Motel 6" and is the biological mother of three children, including A. M. Y. The biological mother's first child died eight months after birth at the hands of his father, who is currently serving a 30-year prison sentence at the Naval Air Station, Norfolk, Virginia, for the crime. Her second child is four years of age, resides with his mother and is to a large extent cared for by his maternal grandmother. A. M. Y. is an illegitimate female and was born on June 30, 1986. The putative father deserted the biological mother prior to A. M. Y.'s birth and has since had no contact with the biological mother or A. M. Y.

Several months prior to the birth of A. M. Y., the biological mother worked "part-time" at "Rax's Restaurant" and, after it became apparent that she was pregnant, the biological mother informed

her supervisor, Judy Timmons, that "she was going to have to give [the child] up [because] she couldn't afford to keep [the child] at that time." The biological mother then "asked [Ms. Timmons] if [she] knew anywhere she could go, anybody that wanted a baby at that time." Ms. Timmons informed her that she was acquainted with "a good family at church" who then resided in Jacksonville, Florida that was seeking to adopt a child and she gave the biological mother petitioner's telephone number. The biological mother contacted petitioner, informed her that she was willing to "give [the baby] up for adoption" and later made arrangements to surrender the child to petitioner.

Petitioner was at the hospital in Albany, Georgia when A. M. Y. was born. Two days later, the biological mother surrendered A. M. Y. to petitioner. The biological mother executed the following document at the time of surrender: "I, . . . being of sound mind and without any pressure of any kind, do willingly grant custody of [A. M. Y.] to [petitioner]. [Petitioner] has my permission to take said child into her home in Florida and provide for her physical & emotional needs. [Petitioner] has agreed to pay all medical bills connected with the care of [A. M. Y.]." The biological mother also gave petitioner a copy of A. M. Y.'s birth certificate and executed the following medical release: "[Petitioner] has my permission to take [A. M. Y.] for medical treatment."

Although A. M. Y.'s maternal grandparents were not acquainted with petitioner and were aware of their daughter's intention of relinquishing custody of their grandchild to petitioner, they elected not to assume custody of the baby and they did not arrange visitation with A. M. Y. At the time the child was surrendered to the petitioner, neither the biological mother nor the grandparents requested information regarding petitioner's address and they did not require the petitioner to report to them regarding A. M. Y.'s condition. In fact, they exhibited no conduct which evidenced an intent to remain in contact with A. M. Y.

Shortly after petitioner obtained custody of A. M. Y., she and her husband returned to Jacksonville. In July 1987 petitioner and her husband moved to Milan, Georgia. On or about August 8, 1987, petitioner separated from her husband and moved to Albany, Georgia, where she and A. M. Y. began residing with petitioner's parents. Two days after petitioner returned to Albany, she "went to see [the biological mother] at her residence," informed the biological mother of her imminent divorce and inquired if her domestic circumstances influenced the biological mother's desire to allow petitioner to adopt A. M. Y. The biological mother affirmed her desire for A. M. Y. to be adopted by petitioner and acknowledged petitioner's need to fulfill a "residency requirement" before perfecting the adoption.

Immediately following her divorce on February 15, 1988, petitioner contacted the biological mother and made arrangements for them to execute the adoption papers. At this time, petitioner explained to the biological mother that the adoption would require her surrender of parental rights and execution of "a paper saying that she understood what she had [done]." The biological mother agreed to perform the procedure and agreed to execute the documents necessary for the adoption. Two days later, the parties met at petitioner's attorney's office and the biological mother informed petitioner that she "couldn't go through with the adoption, and [that] she wanted to see [A. M. Y.] that day. . . ." Petitioner agreed to bring A. M. Y. to the biological mother that afternoon; however, upon the advice of her attorney, petitioner did not comply with the agreement and subsequently filed a petition for adoption pursuant to OCGA § 19-8-6. From this and other evidence at the hearing, the superior court entered an order terminating the biological father's and mother's parental rights and allowing petitioner to adopt A. M. Y. This appeal followed. *Held*:

1. "Generally, a child remains under the control of his biological parents until he reaches majority, unless parental power is lost by any of the ways recognized by law. Ways in which parental power may be lost include: a) 'Voluntary contract releasing the right to a third party.' OCGA § 19-7-1 (b) (1); and b) 'failure to provide necessaries for the child or abandonment of the child,' OCGA § 19-7-1 (b) (3)." *In re M. A. F.*, 254 Ga. 748, 750 (1), 751 (334 SE2d 668).

Although OCGA § 19-7-1 (b) provides "that parental power may be lost by voluntary contract, . . . the evidence must establish clear, definite, and unambiguous terms of such contract before a relinquishment of parental rights will be found. *Shaddrix v. Womack*, 231 Ga. 628 (203 SE2d 225) (1974); *Waldrup v. Crane*, 203 Ga. 388 (46 SE2d 919) (1948); *Beavers v. Williams*, 199 Ga. 113 (33 SE2d 343) (1945)." *Blackburn v. Blackburn*, 168 Ga. App. 66, 70 (1), 71 (308 SE2d 193). In the case sub judice, the biological mother executed documents granting "custody" of A. M. Y. to petitioner and allowing petitioner "to take [A. M. Y.] for medical treatment." These documents alone were insufficient to establish "clear, definite and unambiguous terms" of a contract for the relinquishment of parental rights. See *Johnson v. Smith*, 251 Ga. 1, 2 (2) (302 SE2d 542). However, this evidence, along with other "clear and convincing" evidence showing the biological mother's desire to sever the parental relation and throw off all obligations growing out of that relation, was more than sufficient to establish a "clear, definite and unambiguous" relinquishment contract that was binding on the biological mother. See *In re M. A. .F.*, 254 Ga. 748, 750 (1), supra. More specifically, the biological mother contacted petitioner during her pregnancy and indicated to petitioner that she

was willing to "give [the baby] up for adoption." The biological mother later made arrangements for petitioner to take custody of the child. Relying on these representations, petitioner arrived at the hospital at the time of A. M. Y.'s birth and, two days later, received custody of the child from the biological mother. At this time, the biological mother executed documents, relinquishing "custody" of A. M. Y. to petitioner and allowing petitioner to take A. M. Y. for medical treatment.

In the document wherein the biological mother relinquished custody of A. M. Y. to petitioner, she acknowledged that A. M. Y. would thereafter reside in Florida, yet she made no arrangements to visit with the child or remain in contact with petitioner. In fact, for almost 20 months after the biological mother relinquished custody of A. M. Y. to petitioner, she neither visited A. M. Y. nor contacted petitioner.[1]

Over a year after petitioner received custody of A. M. Y., she "went to see [the biological mother] at her residence" and the biological mother again affirmed her desire to relinquish parental rights of A. M. Y. and allow petitioner to adopt the child. Following this conversation, petitioner enjoyed over six months of custody and control of A. M. Y. with the biological mother's consent and without the biological mother's influence. It was not until after petitioner sought to complete the adoption that the biological mother showed any resistance to the adoption or inclination to visit with A. M. Y.

Finally, A. M. Y.'s biological parents have not provided or attempted to provide financial support for the child. This responsibility was fully assumed and accomplished by petitioner, who has loved, cared and provided for A. M. Y. since birth. "When 'duty and control is lost or alienated to a third person by any of the means recognized by law, then such third person stands in loco parentis to the child,' *Waldrup v. Crane*, 203 Ga. 388, 391 (46 SE2d 919) (1948), and parental power 'remains in the third person until the child reaches majority(,)' *Carswell, Moxley & Son v. Harrison*, 33 Ga. App. 140 (126 SE 293) (1925), unless of course the third party loses or forfeits the right to custody or becomes unfit for retaining custody. *Carter v. Brett*, 116 Ga. 114 (42 SE 348) (1902); *Saxon v. Brantley*, 174 Ga. 641 (163 SE2d 504) (1932); *Shope v. Singleton*, 196 Ga. 506 (27 SE2d 26)

---

[1] Despite the biological mother's contention that petitioner was secreting A. M. Y., the overwhelming evidence showed that the biological mother had access to information regarding petitioner's whereabouts at all times. Other relevant evidence showed that the biological mother was in Jacksonville, Florida on business for a two-week period in February 1987 and, after two failed telephone attempts to contact petitioner, the biological mother made an attempt to visit A. M. Y. at petitioner's home. However, after driving "around trying to find the street and the house" for about "an hour and a half," she abandoned the effort when she "couldn't find it."

(1943); *Triplett v. Elder*, 234 Ga. 243 (215 SE2d 247) (1975)." *In re M. A. F.*, 254 Ga. 748, 750 (1), 751, supra. The circumstances of the case sub judice clearly demonstrate that the biological mother relinquished her parental rights to petitioner and that petitioner responded by providing A. M. Y. with consistent parental love, guidance, sustenance and control. Consequently, we will not disturb the superior court's holding terminating the biological father's and mother's parental rights and allowing petitioner to adopt A. M. Y. See *In re A. J. A.*, 164 Ga. App. 210 (2), 211 (4) (296 SE2d 103).

2. We find no reversible error in the superior court's failure to consider an investigation and report by the Department of Human Resources as provided by OCGA §§ 19-8-11 and 19-8-12, as there was no evidence refuting petitioner's testimony that she has provided A. M. Y. with a stable and loving home environment. *Chandler v. Cochran*, 247 Ga. 184, 185 (2) (275 SE2d 23).

*Judgment affirmed. Pope and Benham, JJ., concur.*

DECIDED JANUARY 9, 1989 —
REHEARING DENIED JANUARY 19, 1989.

*Paula K. Hanington*, for appellant.
*Robert H. Revell, Jr.*, for appellee.